UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

       Plaintiff,

 -vs-                         Case No. 18-CR-133-JDP

ROBERT HOSLER,              Madison, Wisconsin
                              May 17, 2019
        Defendant.        9:29 a.m.
_____

STENOGRAPHIC TRANSCRIPT OF COURT TRIAL/PLEA HEARING
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

                Office of the United States Attorney
                BY:  ELIZABETH ALTMAN
                    DIANE L. SCHLIPPER
                Assistant United States Attorneys
                222 West Washington Avenue, Suite 700
                Madison, Wisconsin  53703

For the Defendant:

                Federal Defender Services of Wisconsin
                BY:  JOSEPH A. BUGNI
                22 East Mifflin Street, Suite 1000
                Madison, Wisconsin  53703

Also appearing:    ROBERT HOSLER, Defendant
                Detective WADE BEARDSLEY, Eau Claire Police
                      Department
                KRISTEN MOHR, Intern

Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703
(608) 261-5709

**INDEX OF WITNESSES**

| GOVERNMENT'S WITNESSES | EXAMINATION | PAGE |
|---|---|---|
| WADE BEARDSLEY | Direct Examination by Ms. Altman | 19 |
| | Cross-Examination by Mr. Bugni | 67 |
| | Redirect Examination by Ms. Altman | 82 |

**INDEX OF EXHIBITS**

| GOVERNMENT'S EXHIBITS | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| A | PalFinder Ad | 24 | 4 |
| A-002 | "What is PalFinder?" | 23 | 4 |
| C | Gmail emails - 8/12/18 to 8/22/18 | 26 | 4 |
| D | Protonmail/Secmail emails | 35 | 4 |
| E | Gmail emails | 45 | 4 |
| F | Gmail emails | 54 | 4 |
| H | Text messages | 56 | 4 |
| I | Unredacted flight itinerary | 47 | 4 |
| J | Rental car agreement | 54 | 4 |
| K | Screenshot - Amazon shopping cart | 50 | 4 |
| L | STD test results | 48 | 4 |
| M | STD test results | 50 | 4 |
| N | Redacted flight itinerary | 46 | 4 |
| O | Photo - U.S. currency | 54 | 4 |
| P-1 | Cameras/Scene Lighting | 40 | 4 |
| P-2 | GoPro Cameras | 40 | 4 |
| P-3 | Handheld camera | 40 | 4 |
| Q | Princess dress | 51 | 4 |
| R | Underwear | 43/52 | 4 |
| S | Photos - cell phone | 61 | 4 |

* * *

19      (Proceedings called to order at 9:29 a.m.)

20          THE CLERK:  Case No. 18-CR-133, the *United States of*

21  *America v. Robert Hosler*, called for a court trial.

22      May we have the appearances, please.

23          MS. ALTMAN:  Good morning, Your Honor.  The United

24  States appears by Elizabeth Altman and Diane Schlipper, and also

25  with us is Detective Wade Beardsley from the Eau Claire Police

1    Department.

2         THE COURT:  Good morning to all of you.

3         MR. BUGNI:  Good morning, Your Honor.  Joe Bugni

4    appearing on behalf of Mr. Robert Hosler.

5         THE COURT:  Mr. Hosler, Mr. Bugni, good morning to you.

6      All right.  So I've got some paperwork up here.  One of them

7    is the waiver of jury trial, and if I remember correctly, we did

8    a little colloquy about the waiver before, so I've got it in

9    writing, and so I am going to -- Mr. Bugni, why don't you just

10   put it on the record.  We did the colloquy the week before.

11        MR. BUGNI:  Your Honor, you're correct.  We did the

12   colloquy, and I had no objections to that.

13        THE COURT:  Okay.

14        MR. BUGNI:  Your Honor, one other small matter.

15        THE COURT:  Yes.

16        MR. BUGNI:  An intern from our office, Ms. Kristen

17   Mohr, has helped with this case, and I was hoping that she could

18   sit at counsel table to remind me if I'm going on too long or

19   pass me notes.

20        THE COURT:  That would be fine.

21        MR. BUGNI:  Thank you.

22        THE COURT:  All right.  And then I also note that I

23   have a number of stipulations that have been presented to me.

24   It looks like everybody has signed off on them.

25        MS. ALTMAN:  Most of them will become irrelevant, Your

1      Honor, with a plea to Count 3.

2                THE COURT:  Okay.  And so --

3                MS. ALTMAN:  The only one that really matters at this

4      point is the admissibility of the evidence, and at this point we

5      would just move everything in.

6                MR. BUGNI:  And we have no objection.

7                THE COURT:  Okay.  So the following evidence is

8      admissible through Eau Claire Police Department Detective Wade

9      Beardsley without foundation, hearsay, or other objections.  So

10     we've got the communications between defendant and Beardsley,

11     evidence found in the defendant's car, on his person when he was

12     arrested in Eau Claire.  Just to be clear, I looked at all of

13     the -- I got a binder with the government's exhibits yesterday.

14     I assume Mr. Bugni has the same binder, or at least the same

15     exhibits.  So I reviewed all the communications.  I know what

16     those are.  Evidence found in the defendant's car and on his

17     person when he was arrested in Eau Claire.  Those are depicted

18     in photographs that were in the binder that I got.  Documents

19     from Frontier Airlines regarding the defendant's air travel from

20     Texas to Minnesota.  I think those were in the binder too.

21     Documents regarding the defendant's vehicle rental in Minnesota.

22     That's the National Car Rental contract and receipt.  And the

23     approximate speed the defendant traveled when driving from

24     Minneapolis to Eau Claire.  That's a new one.  I don't know if

25     I -- that wasn't in the binder but --

```
 1              MS. ALTMAN:  It was not.  There will be testimony, Your
 2    Honor --
 3              THE COURT:  Okay.  All right.
 4              MS. ALTMAN:  -- that he was driving quite fast.
 5              THE COURT:  Okay.  All right.  Very good.  Okay.  So I
 6    will accept these stipulations, so we have those.
 7         How should we proceed?
 8              MS. ALTMAN:  I believe there's still going to be a plea
 9    to Count 3.  We could do that.  I think we also still need to
10    resolve the 404(b) issue.
11              THE COURT:  Okay.
12              MS. ALTMAN:  I guess we could just -- something I did
13    clarify with Mr. Bugni, based on his trial memo, that the
14    parties agree, although Mr. Bugni is preserving for argument,
15    the fact that the statute can be violated by adult-to-adult
16    communication.  Obviously he's going to argue even with
17    adult-to-adult communication, it wasn't violated in this case,
18    and we will argue that it is, but as a matter of law, the
19    current law at this point, the statute can be violated by
20    adult-to-adult communication.
21              THE COURT:  So that's kind of the threshold issue.
22    Like, that seems to be clearly established by the cases that
23    have been cited.  *McMillan* I think is our lodestar or our
24    guidepost here in the Seventh Circuit.  There are some fine
25    points to be resolved about what kind of adult-to-adult
```

1    communications are sufficient to establish -- to constitute the

2    crime, but at least at the outset, what seems to be beyond

3    dispute is that it can be violated by some kinds of

4    adult-to-adult communication.  There's no requirement that there

5    be any actual communication with the minor.  That's what we're

6    in agreement with?

7            MR. BUGNI:  That's the current state of the law, Your

8    Honor.  I would just give this caveat that I believe Ms. Altman

9    was trying to preserve for my own objection, is that that is

10   very true under *McMillan*, but the clear text would -- doesn't

11   really provide for that.  That's the gloss that the Seventh

12   Circuit has put on there.  If the Supreme Court took *cert* on any

13   case, we would say that this argument is preserved because there

14   is a split among the circuits on how we're going to, you know,

15   really read 2422.

16           THE COURT:  At the moment, that split is about what

17   kind of adult-to-adult communications are adequate to support

18   the charge.

19           MR. BUGNI:  Correct.  And so, like, let's say they take

20   *cert*, and they're, like, "Well, what, are you kidding me?  Like,

21   it doesn't even say, like, an adult.  No, it has to be to

22   the" --

23           THE COURT:  So it's conceivable that even

24   adult-to-adult that there would literally be a requirement of

25   actual communication with the minor, in which case all this law

1        would be bad law.

2              MR. BUGNI:  That's right.

3              THE COURT:  Okay.  At the moment, within the limited

4        authority that I have, that's what we're stuck with.

5              MR. BUGNI:  That's correct.

6              THE COURT:  Okay.  I understand that.  Okay.

7              MS. ALTMAN:  And so then, just to follow up a little

8        bit on what Your Honor said about the fine points, as far as the

9        process today and particularly the closing argument, I mean, the

10       government anticipates that this is going to be like a closing

11       argument to a jury and not an appellate argument or something

12       where we're citing cases.  We're going to say this is why the

13       law applies, and Mr. Bugni is going to say why it doesn't.

14             THE COURT:  There seems to be a relatively small

15       universe of case law that's really pertinent to me, mostly

16       *McMillan*, but *McMillan* said, okay, there are three kind of

17       theories of how adult-to-adult communication could work.  One is

18       the narrowest, and that is in which the adult is used as an

19       intermediary between the defendant and the child, and so that's

20       present in McMillan's case.  That's all we need to reach.  We

21       don't need to worry about the other categories, which might be

22       sufficient, but we don't reach that here.  So I don't know if

23       there's a lot of other cases to reach on that, but I need to

24       find the facts here, and I think I have a pretty good idea of

25       the facts because I read the exhibits.  So you're going to call

1   Mr. Beardsley.  He's going to explain some of this to me though.

2           MS. ALTMAN:  Yes.

3           THE COURT:  Okay.  Do we want to do the plea first?

4           MR. BUGNI:  Yeah.

5           THE COURT:  I don't have my script.

6           MR. BUGNI:  I mean, we can do it afterwards.  I think,

7   you know, you know we're going to plead to Count 3.

8           THE COURT:  Yeah.

9           MR. BUGNI:  You know that Count 2 we don't contest, so,

10  you know, like, we offered to enter into a stipulation they can

11  prove beyond a reasonable doubt all these elements.  You can

12  take judicial notice of the fact that it's Wisconsin Statute

13  whatever it is.

14          THE COURT:  Yeah.  Okay.  So we'll do the plea later.

15  You know, I probably could do it from memory, but by my raising

16  the issue now, the people who are listening in our vast radio

17  audience will be scurrying now to prepare a script for me to do

18  the plea on Count 3, and so we can do that later.  I understand

19  where you're going with that.

20       Okay.  Should we address the 404(b) issue?

21          MS. ALTMAN:  I think so.

22          MR. BUGNI:  Yeah.

23          THE COURT:  Okay.  So let me tell you where I land on

24  this.  Essentially, I have to do the analysis under *Gomez*, and

25  so I have to call upon the government to show a nonpropensity

1    basis for admitting this evidence.  I think I see one, and so

2    we'll explore that a little bit, but then even if there is a

3    nonpropensity basis for admitting it, and not just a

4    nonpropensity basis but a propensity-inference-free chain of

5    logic that allows it, even then I have to do a 403 analysis, and

6    that's where the trouble arises for me.

7        It's this:  It's that the -- I'm not sure what element is

8    really in dispute here because Mr. Hosler's intent seems to be

9    so amply established by the communications with Officer

10   Beardsley that it just doesn't seem to be really much of an

11   issue, and so I'm not sure -- I'm not sure exactly what it is

12   that you need it for that isn't already amply supplied by other

13   evidence.

14       MS. ALTMAN:  Well, all I can tell you, Your Honor, is

15   that we do have to prove intent.  We think it goes to intent.

16   We can't ask you or a jury to say "Come back to us if you don't

17   think this is enough."  We have to present our case that we

18   have.

19       THE COURT:  Well, one thing you could do is you could

20   present your case, then see what Mr. Hosler disputes about it,

21   and then in rebuttal you could say, "Actually, he did dispute

22   this element, this motive or his intent, and so here's the

23   evidence."  So that is contemplated in *Gomez*, that you might be

24   able to say, "Well, let's see if it's actually disputed."  But

25   also let's -- just tell me first -- let's do the first level of

1    analysis.  I've thought about it over the last day or so to try

2    to figure out how it might -- what propensity-free chain of

3    reasoning would support its admissibility, but I won't put words

4    in your mouth.  You tell me.

5         MS. ALTMAN:  Propensity-free chain of reasoning.

6         THE COURT:  Yes.  So you have -- obviously you can't

7    put it in because --

8         MS. ALTMAN:  Right.

9         THE COURT:  -- you'd say, like, "Okay.  Look, he's just

10   got a propensity to be a bad person or to assault children" or

11   something along those lines.  You have to be able to show here

12   is an element that we have to prove, and this is evidence of it.

13        MS. ALTMAN:  We have to prove that he intended to -- he

14   traveled with the intent to have sexual contact with a -- what

15   he believed to be a 12-year-old girl.

16        THE COURT:  Yes.

17        MS. ALTMAN:  We believe the evidence would establish

18   that the images were of 8 to 10 to 12-year-old girls on the --

19   engaged in sexually explicit conduct, which shows his interest,

20   which shows his intent as to why he traveled here.  Mr. Bugni

21   brought up in the hearing the other day if it's 8-year-old boys,

22   it's not there.  We agree.  But it's not 8-year-old boys.  The

23   pictures, the depictions, are of the age of the girl at issue,

24   fictitious girl, at issue in this case.

25        THE COURT:  Now, I think *Gomez* and other cases

1    recognize how close things like intent and motivation come to

2    propensity sort of inherently, and so aren't we awfully close to

3    saying, "Look, he is a pederast, and this shows that he has this

4    propensity to commit these kinds of crimes"?

5         MS. ALTMAN:  Well, I think that there has to be -- I

6    mean, they don't get rid of 404(b), and so there has to --

7    intent has to be -- I mean, it has to be something, and we're

8    saying -- we're not saying because he had this, he was going to

9    do it, but we're saying it shows that he wanted to do it.  It's

10   sort of -- I see -- I mean, it is close.  There's no dispute

11   it's close --

12        THE COURT:  Well, and, in fact, this is specifically

13   called out in *Gomez* as the thorny issue, that if you want to use

14   other acts to show intent, the unfair prejudice that comes from

15   it almost necessarily follows because -- or at least some

16   element of prejudice follows because intent is so close to

17   propensity.

18        MS. ALTMAN:  It is.  I mean, there is no dispute about

19   that.  If the Court would rather we wait and see, you know, in

20   rebuttal -- it would save us an appellate argument upon

21   conviction -- I mean, that's certainly fine.  I mean, as the

22   Court noted, there is a lot of intent shown in those messages,

23   but we do have to prove it.

24        THE COURT:  Yeah.  I agree with that, but you have to

25   prove it with evidence that is established by a propensity-free

1    chain of reasoning.

2         Okay.  Mr. Bugni.

3              MR. BUGNI:  I don't think --

4              THE COURT:  Let me tell you how I see it.  Let's

5    imagine that Mr. Hosler drove from Minneapolis to Eau Claire --

6    well, rewind a little bit.  Mr. Hosler had engaged in a chat

7    room conversation with the young lady, but the chat room was not

8    "I love older men."  The chat room was "I love horses."  So he

9    engages in the conversation with a 12-year-old girl about their

10   mutual interest in horses and then says "Would you like to come

11   to my farm where I have stables and you can ride horses?"  And

12   so he drives from Minnesota to pick up the girl to take her back

13   to the farm, and he's arrested because they think that he's

14   really doing this to engage in sexual activity with the minor,

15   and they find on his phone images of child pornography.  Would

16   that be admissible to show his motive in picking up the girl?

17             MR. BUGNI:  Oh, man, I think -- I think you have such a

18   lack of foundation at that point that it would be very

19   difficult -- I think that would be pure propensity because you

20   wouldn't have something that tips it over or makes it so that

21   it's one or the other.

22             THE COURT:  Add to this that he doesn't even have a

23   farm.

24             MR. BUGNI:  He doesn't have a phone?  Oh, he doesn't

25   have a farm.  Yeah.  It's just a complete ruse.

1          THE COURT:  It's a complete ruse, but there's nothing

2     in the communications that says why he wanted to pick up this

3     young lady, and it certainly sounds sketchy, but there's nothing

4     to establish that it would be for sex until we look at his

5     phone, and then we find child pornography on his phone, and then

6     that would be evidence of motive.

7          MR. BUGNI:  No, I think you don't have enough

8     foundation at that point.  I think then you're really looking at

9     pure propensity to fill in the gap that you don't have.  If I

10    can just give you a closer example than maybe you would want is

11    what if he was trying to get her to be a model?  You know, like

12    I'm really interested in -- like, you know, Kohl's has all those

13    shoots of girls in bathing suits, and really we're trying to get

14    it so that this was child pornography.  Then I would probably

15    put it -- then I think they would have a propensity-free -- you

16    know, you would be able to fill in that gap that otherwise would

17    be shady.  And so in that case, yes; in your scenario, no.  In

18    your scenario, the propensity is actually filling in what you

19    otherwise don't have at all for that motive or that intent.

20         I think, Your Honor, and I don't want to belabor the point,

21    but I think the biggest part is if we do challenge, you have me

22    as an officer of the court saying we're going to concede Count

23    2.  Everybody knows that, you know, maybe you're still going to

24    walk him, and if that does, then I'll be asking for a bench

25    trial all the time.  But we can just kick this down the road.

1    We're not going to challenge intent.  We can just get it on with

2    the evidence we need, and let's just go to war over Count 1.

3         THE COURT:  Uh-huh.  Yeah.  I think, honestly, I think

4    that it would be admissible to show motive, and we know that

5    motive and intent are specifically called out in the rule as --

6    and it's established too in, I think, in *Chambers*.  I know it

7    predates *Gomez*, but it does say that that is motive.  It's a

8    nonpropensity basis for it.  So I think it would be admissible,

9    but in this case, honestly, I see such ample evidence of intent,

10   if that's the issue, that when I do what *Gomez* says, look at

11   whether you really need it, I'm not sure I do.

12       I also will say this:  I don't quite understand the stakes

13   of the controversy here because it's conceivable I'd have to

14   look at it to rule on whether it's telling, and because it's a

15   bench trial, we don't have the issue with prejudice to the jury.

16   And as the judge, sometimes I have to look at evidence that I

17   have to exclude, and in the context of a bench trial, it really

18   is the -- maybe it's a fiction, but it's a necessary one, that I

19   can't really be prejudiced within the meaning of the rules here

20   by seeing the evidence, and so if it has to come in, there

21   really isn't the unfair prejudice thing.  I take Mr. Bugni's

22   point, it's just nasty stuff that nobody wants to look at, but

23   that doesn't seem to really be the thing that should be driving

24   the decision-making here.

25       So I'm not sure really why -- I mean, I know the government

1    has an interest in making sure that it proves its case, but I'm

2    not sure really why, if I decide that intent is established, the

3    government really needs to put it on if I'm the trier of fact,

4    and I'm not really sure why Mr. Bugni is so keen to have it kept

5    out.  I infer that maybe both sides just think that it will have

6    an impact on my sentencing if I'm really horrified by the

7    images.

8            MR. BUGNI:  I mean, part of it, we stand on the law.

9    You know, like, I actually really do believe in these

10   principles, and I really want a quick, fair trial, you know,

11   narrowed in on the issues, but also, Your Honor, if I just --

12   two things for you to consider.  So we're fighting it.  We know

13   that it has an impact, but it has an impact on all of us.  You

14   know, none of us want to see that stuff.  That stuff really

15   haunts you.  Like, it's the worst part of this job, so the less

16   that anybody in this courtroom has to look at it, we're in a

17   better world.

18       The second point I would make, Your Honor, is you should

19   read *McMillan's* -- the second part of *McMillan*, so actually all

20   404(b), and they actually call out *Chambers*.  *Chambers* isn't a

21   very good opinion.  It's like those two sentences, and then

22   really he says "It's really propensity" at the end of it.  It's

23   not going to motive and intent.  What you're really doing is

24   trying to fill in gaps of something that's not at issue at that

25   point because the issue would be the sexual activity, not

1    whether or not it's videotaping it.  Like, those are what you're

2    doing because he could fly there to go "And I want to take -- I

3    really want to take bare-chested pictures of a 12-year-old."

4    Totally legal.  That's not child porn.  But "I really want to go

5    have sex with a child," that's intent, that's what violates the

6    law.  So you're kind of equating the two, and you can't conflate

7    those two.  It's a very distinct analysis.

8        And the other reason, Your Honor, that -- you know that

9    there's bad child porn.  You almost launched Steve Brown for a

10   couple extra months because it's so bad.  It's not that we don't

11   know how bad it is.  I think there's just a part of us as

12   lawyers and as officers of the court, it's like, look, let's

13   just play down the line.  Let's just do this, let's do it right,

14   and let's get to the issues we need to.  That's why I fight

15   things.  I'm not trying to fight things needlessly here.  I know

16   you'd have to look at it, but you actually don't need to look at

17   it.  You can go with the description.  So like Ms. Altman said,

18   if it was 8-year-old boys in the description, you don't have to

19   watch a ten-minute video and be like, "Well, hey, that doesn't

20   really apply."  You have to just say, "Yeah, that doesn't do it.

21       THE COURT:  Well, here is what I think -- I'm prepared

22   to handle it.  I'll give the government a rebuttal if -- after I

23   hear from Mr. Bugni that any of this related to intent or motive

24   is really disputed, and I don't think it's going to be.  And so

25   if we need to consider it after we hear the actual defense

1    case -- because as I looked at it, I kind of thought there's

2    enough here-and-there statements that maybe you think maybe the

3    defense is going to be that there's some equivocation about the

4    actual purpose and -- of the trip to Wisconsin, and in other

5    cases, the defense really was that, "Oh, yeah.  No, I never did

6    any of this communication actually to actually consummate a

7    sexual relationship with the girl because I was either trying to

8    smoke out child molesters or it was only just fantasy."  So if

9    he goes down that road, then we can revisit this, but I don't

10   think that's really what's happening here.  So that's my ruling.

11   We'll defer the final ruling on it.  If you need it, we can take

12   it up in rebuttal.

13       So okay.  With the table set, I think we're ready to begin.

14           MS. ALTMAN:  Your Honor, we would call Detective Wade

15   Beardsley.  Oh, I'm just kidding.  Would you like openings?

16           THE COURT:  Wasn't that it?  Yeah.  Give me your

17   opening.  You have 90 seconds.

18           MS. ALTMAN:  It really is only 90 seconds.

19           THE COURT:  Okay.  Good.

20           MS. ALTMAN:  Your Honor, you have gone through the

21   evidence at this point, so that could make this even shorter.  I

22   think it's pretty simple.  I think it's undisputed on August

23   7th, Detective Beardsley was undercover.  He went on PalFinder,

24   which is a site he'll tell you is geared toward an underage sex

25   trade.  He indicated he was a single mother seeking partners for

1    his almost 13-year-old daughter.  On August 12th, the defendant

2    responded.  He indicated he was interested in "the goods," which

3    was a term he used throughout the communications with her.

4    There were weeks of communications, hundreds of emails, texts.

5    They made plans for the defendant to travel to Wisconsin to have

6    sex with this fictitious 12-year-old.  Her name was Gracie.

7    You've already seen all of the communications, but they include

8    things like that the defendant was going to buy her presents, he

9    was going to pay the mom, all the sex acts they were going to

10   engage in, his expressed hope to have a future with Gracie, his

11   repeated promises to treat Tracy like -- or Gracie like a

12   princess, the possibility of videotaping the sexual conduct with

13   her, all of which are elements that we have to show for illicit

14   sexual conduct.  There were also numerous occasions where the

15   defendant asked the mom to relay information to Gracie and asked

16   Gracie what she thought.

17       On August 30th, the substantial steps:  He bought a plane

18   ticket.  He boarded a plane in Austin.  He flew to Minneapolis.

19   He rented a car.  You're going to hear testimony that he sped to

20   Eau Claire.  He was arrested.  Numerous items were found in the

21   car.  You'll see those things.  They included children's

22   clothing that he had talked about, recording equipment he had

23   talked about, and cash that he was going to pay the mom to have

24   access to this fictitious child.  Again, the Court is aware of

25   most of this.  The Court is aware of the elements.  We've

1    already had a discussion about that, and we just ask that at the

2    end that the Court find him guilty.

3              THE COURT:  All right.  Very good.

4         All right.  Mr. Bugni, do you want to have an opening?  Do

5    you want to defer?

6              MR. BUGNI:  I'll waive.

7              THE COURT:  All right.  Very good.

8         All right.  Detective Beardsley.

9              **WADE BEARDSLEY, GOVERNMENT'S WITNESS, SWORN**

10                       <u>DIRECT EXAMINATION</u>

11   BY MS. ALTMAN:

12   Q    Could you state your name and spell it, please?

13   A    Yeah.  My name is Wade Beardsley.

14   Q    How are you employed -- I'm sorry.  I cut you off before

15   you spelled it.

16   A    The spelling of my last name is B-E-A-R-D-S-L-E-Y.

17   Q    And how are you employed?

18   A    I'm a detective with the Eau Claire Police Department.

19   Q    And how long have you been with the Eau Claire Police

20   Department?

21   A    Over seven years.

22   Q    What's your -- how long have you been a detective?

23   A    I've been a detective for over two years.

24   Q    What's your current assignment?

25   A    I'm assigned within the Chippewa Valley Regional Computer

1    Forensics Lab.

2    Q    What do you do within that computer lab?

3    A    I do a few different things.  I process digital evidence

4    for other investigators, so things like cell phones, computers,

5    things like that, and then the other portion of my job is

6    investigating internet crimes against children, which are both

7    reactive and proactive investigations.

8    Q    And can you explain -- first of all, do you have any

9    specialized training to investigate crimes against children?

10   A    I do, yes.

11   Q    And what does that consist of?

12   A    I have attended numerous trainings throughout the country.

13   I've also attended several trainings in the state of Wisconsin

14   put on by the Wisconsin Department of Justice related to

15   internet crimes against children and then also trainings related

16   to undercover chat investigations as well.

17   Q    And I think you described your investigations as either

18   reactive or proactive; is that correct?

19   A    Correct.

20   Q    What kind of reactive cases or what do you mean by

21   "reactive case"?

22   A    Reactive cases would be -- a good example would be the

23   cyber tips that come in through NCMEC.  That's the National

24   Center for Missing and Exploited Children.  Those are typically

25   child exploitation or child pornography-type cases.

WADE BEARDSLEY - DIRECT

```
 1   Q    And what about proactive cases?  What do those consist of?
 2   A    Proactive cases would be the undercover chat investigations
 3   where we're proactively trying to identify persons in our
 4   community and beyond that are trying to exploit children.
 5   Q    And in those proactive-type cases, can you just tell me a
 6   little bit about them?  Do you pretend to be somebody else?
 7   A    Right.  So we can do a few different roles.  We can pretend
 8   to be a little boy or little girl or we can be an adult that has
 9   access to a child or a parent that has, obviously, access to a
10   child that they're trying to traffic for sex.
11   Q    And that's the situation that occurred in this particular
12   case, correct?
13   A    Correct.
14   Q    Can you tell me a little bit about how this investigation
15   started?
16   A    Yeah.  This investigation started on a Tor website called
17   PalFinder.
18   Q    What's Tor?
19   A    It stands for The Onion Router.  It's commonly referred to
20   as the dark web.  It's an anonymous web browser that persons can
21   use to believe that they are not being tracked in any way.
22   Q    Is our -- are sites -- can I Google the site and find it on
23   Tor?
24   A    No, you can't.  So another issue with Tor too is you can
25   create websites and visit websites that are only specific to Tor
```

WADE BEARDSLEY - DIRECT

1    as well, so if you were on a Chrome web browser or Internet

2    Explorer, you couldn't Google or try to find the website

3    PalFinder.  You would have to use Tor.

4    Q    And PalFinder is the site at issue in this case or the site

5    you used?

6    A    Correct.

7    Q    How did you find PalFinder?

8    A    I was provided the link through the Wisconsin Department of

9    Justice, Division of Criminal Investigations.

10   Q    Do you know how they found it?

11   A    I believe they found it through some type of investigation

12   that they were working on.

13   Q    And other than being provided the information by a law

14   enforcement officer, how would other people possibly find out

15   about PalFinder?

16   A    So there are -- within Tor, there are child pornography

17   wikis where basically there are dozens or even hundreds of links

18   to various child pornography-type websites that are only

19   accessible through Tor.

20   Q    Do you have a description of what you would characterize --

21   how you would characterize PalFinder?

22   A    Yes, I do.

23   Q    What would that be?

24   A    PalFinder is a website that is specific to the trafficking

25   of children for sex.  The ads that you'll see on PalFinder are

1      of people that are seeking underage sex or it is people that

2      have access to children who are trafficking them for sex.

3      Q    And I'm going to jump ahead quite a bit, but ultimately in

4      this investigation, did you interview the defendant?

5      A    I did, yes.

6      Q    And did you ask him about his knowledge of PalFinder?

7      A    Yes, I did.

8      Q    What did he say his knowledge of PalFinder was?

9      A    He said he understood what PalFinder was, and he knew what

10     the main purpose of the website was as well.

11     Q    And if I could have you look at Exhibit A-002.  It will be

12     on your screen.  Where did that come from or what is that?

13     A    Yeah.  So that's towards the bottom of the main page for

14     PalFinder.  It's basically the description that the creators of

15     PalFinder made.

16     Q    And what do they tell you about your safety and privacy?

17     A    Right.  So they're basically just saying that it's a "safe,

18     anonymous service to find friends with similar interests."

19              MR. BUGNI:  Your Honor, I'm just going to object to

20     relevance.

21              THE COURT:  Overruled, but we don't need to belabor it,

22     I think.

23              MS. ALTMAN:  That's fine.

24     BY MS. ALTMAN:

25     Q    If I could have you take a look at Exhibit A, please.  What

1    is that?

2    A    This is the ad that I posted on PalFinder.

3    Q    And who's Amanda?

4    A    Amanda is the undercover persona that I'm using in this

5    investigation.  That's me.

6    Q    And you say that you're in Wisconsin; is that right?

7    A    Correct.

8    Q    And tell me about those interests.

9    A    Right.  So the interests are "swap," "young," "6 to 14yo,"

10   and "girls."  So "swap" would be basically one of my interests

11   could be that I might be interested in trading my child for

12   someone else's child.  "Young," again, is just kind of the

13   general interest of the website as a whole.  "6 to 14yo," "yo"

14   stands for "years old," so that's kind of the age range that I'm

15   investigating or looking for, and then "girls," so, again, in

16   the ad -- the body of the ad, you can see that I'm the single

17   mom of a 13-year-old daughter, so "girls" is just the gender

18   that I'm interested in.

19   Q    Okay.  And let's talk about that "13yo."  In -- why did you

20   use "13yo"?

21   A    Basically just to establish age and just a general

22   description of who I have access to.

23   Q    And there are other conversations where you indicate that

24   your fictitious daughter is 12, correct?

25   A    Correct.

WADE BEARDSLEY - DIRECT

1    Q    So why do you use 13 here?

2    A    Right.  So in the conversations preceding this, I tell the

3    defendant --

4          MR. BUGNI:  Judge, I'm going to object to relevance.

5    Why he does something is not relevant to any of the elements in

6    dispute.

7          THE COURT:  No, I think I want to understand what the

8    age posting is.  Okay.  Go ahead.  It's overruled.

9          THE WITNESS:  So in the conversations following, I tell

10   the defendant that my daughter would be turning 13 next month.

11   BY MS. ALTMAN:

12   Q    So why did you use 13 here as opposed to 12 or almost 13?

13   Is there any reason?

14   A    Not specifically, no.

15   Q    Okay.  You then provide a Gmail address; is that correct?

16   A    Correct.

17   Q    And is that how you want people to respond to you?

18   A    Correct.

19   Q    What date did you place this ad?

20   A    I placed it on August 7th of 2018.

21   Q    And I'm going to have you just briefly look at the Exhibit

22   C, which is in front of you in the binder, and just describe

23   generally what that is.

24   A    Those are the email communications between myself and the

25   defendant.

WADE BEARDSLEY - DIRECT

1    Q    And what's the date range of those?

2    A    They're going to be starting on August 12th and ending on

3    August 22nd.

4    Q    And so did someone respond to your PalFinder ad?

5    A    Yes.

6    Q    Okay.  And what was the username of the person who

7    responded?

8    A    Right.  So the username was Roger Smith, and the email

9    account that they were using was oghost757@gmail.com.

10   Q    What was the date of the response?

11   A    August 12th.

12   Q    Oh, I'm sorry.  You just said that.  Who was the first --

13   well, let me back up.  The first thing on the page says "Saw

14   your post.  I'm interested in the goods."  Is that the first

15   response to your ad from this particular person?

16   A    Yes.

17   Q    And what did you take "goods" to mean?

18   A    I interpreted "goods" as meaning my daughter, my fictitious

19   daughter.

20   Q    What was your fictitious daughter's name?

21   A    Gracie.

22   Q    What was your response to his interest?

23   A    I asked him where he's located.

24   Q    And why did you do that?

25   A    I wanted to make sure that he wasn't going to be at such a

────────────── WADE BEARDSLEY – DIRECT ──────────────

1    great distance that the meet-up wouldn't happen.

2    Q    And then you found out he's in Texas, and what did you do?

3    A    I tell him right away that's too far and that we live in

4    Wisconsin.

5    Q    And why did you try to put him off like that?

6    A    I'm trying to kind of make him jump through some hoops in

7    order for this meet-up to happen if it's going to at some point,

8    so I'm essentially trying to give him some kind of an out.

9    Q    And this Amanda Pearson that goes throughout these emails,

10   that's your persona; is that right?

11   A    Correct.

12   Q    Now, if you look at C-002, there's a picture of a child on

13   there.  What was the purpose of sending that picture?

14   A    He requested a chance to see the goods, and, again, I

15   believed he was referring to my fictitious child, Gracie.

16   Q    Now, is this a real child?

17   A    No, it's not.

18             THE COURT:  Could you clarify what you mean by that?

19             THE WITNESS:  Yeah.

20             THE COURT:  Gracie is made up.  I get that.

21             THE WITNESS:  Uh-huh.

22             THE COURT:  But is this photograph -- this is an actual

23   child.

24             THE WITNESS:  It's been doctored, so it's not a

25   completely real image.

──────WADE BEARDSLEY - DIRECT──────

```
1              THE COURT:  Okay.
2    BY MS. ALTMAN:
3    Q    Did you begin discussing having a meeting with this person
4    as Roger Smith?
5    A    Yes.
6    Q    Okay.  Through the course of these -- no specific message,
7    but that was the general gist of your communication throughout
8    the next month, correct?
9    A    Correct.
10   Q    At this point early in the investigation, did you have any
11   idea who Roger Smith was?
12   A    No, I didn't.
13   Q    Okay.  Did he indicate whether or not he wanted to come to
14   Wisconsin?
15   A    Yes, he did.
16   Q    And if you look at page C-003, you know, you're asking him
17   questions about whether he's obese and talking to him about
18   staying in a nice hotel.  Why are you doing that?
19   A    Right.  And, again, I'm trying to put up more hoops for him
20   to jump through for this entire transaction to kind of happen.
21   So, again, I'm trying to give him more opportunities for him to
22   back out of the interaction that we're having.
23   Q    If you could look at page C-004, the very first email is
24   "How much will the goods be and how long?"  What did you
25   understand him to be asking?
```

1    A    So I interpreted that as how much money he would need to

2    pay me and for how long he could have interactions with my

3    daughter.

4    Q    What was your response?

5    A    I said it would probably be about an hour, and for one

6    hour, it would be $200.

7    Q    And did he want possibly more than that?

8    A    Yes, he did.  He said that he was looking for an entire

9    weekend.

10   Q    And did he also ask about the cost of that then?

11   A    Correct, yeah.  He asked how long it would be for an entire

12   weekend.

13   Q    If you look at page C-005, there's a question about midway

14   through, "Any articles of interest she can wear?"  And then the

15   next one is "How experienced are the goods?"  What did you

16   understand that to mean based on your training and experience?

17   A    Right --

18        MR. BUGNI:  Objection, Your Honor.

19        THE COURT:  Sustained.  He's just testifying as a fact

20   witness, so if you want to put an expert witness, we're going to

21   really need to segregate that so he can tell me what his expert

22   qualifications are and what he's testifying to as an expert

23   rather than somebody who is really deeply involved in the facts

24   of this case.

25        MS. ALTMAN:  Your Honor, I don't -- any officer who is

1    on the street or any of us have training and experience in what

2    we do.  He indicated he's trained in undercover, that he works

3    for the Crimes Against Children Task Force --

4             THE COURT:  I have no doubt he has some experience, but

5    the Seventh Circuit has cautioned us not to blend in the factual

6    testimony with the expert testimony, and so what I think goes on

7    here is that we've got these communications, and we can tell

8    from context what they mean, but to suggest somehow that they're

9    subject to an expert interpretation confuses the issues and

10   doesn't give the defense a fair chance to impeach the expert

11   opinion about what these things mean because I don't think there

12   really is expert evidence being brought to bear on this.  I

13   think this is just a contextual interpretation of what these

14   communications mean, and so to try to either dignify it as

15   expert evidence I think is inappropriate, but also it mixes the

16   kind of testimony that we're getting, and the Seventh Circuit

17   has cautioned us to really keep them separate.

18       So if you want to have some session of the testimony that's

19   really about his expert preparation and what he can bring to

20   bear as an expert, I'm fine with that, but we have to segregate

21   that so I know where he's talking as an expert and we can talk

22   to him about his expertise and how he gets this information that

23   these things mean what they do.  I think we're just talking

24   about kind of common sense inferences that he draws from the

25   context of the communications, so that's why I think it's

1    appropriate to segregate where he's going to go as an expert

2    from where he goes as just a -- common sense inferences he draws

3    as an investigator.

4              MS. ALTMAN:  Okay.

5    BY MS. ALTMAN:

6    Q    So when he asked about "articles of interest," what did you

7    take that to mean?

8    A    I interpreted that as if she could dress up in a certain

9    way that would be of interest to him.

10   Q    And what about when he asks about experience?

11   A    I took that in a sexual manner.

12   Q    So what were your responses to those questions?

13   A    I told him that she enjoyed dressing up as a princess, and

14   I said that she's been experienced since she was around 2 years

15   of age.

16   Q    If I could have you take a look at C-006.  He asks "So

17   nothing is off limits?"  And how do you respond?

18   A    I respond by she can do anal, vaginal, and oral sex, and

19   then I follow up with saying that a condom would be required

20   unless he can prove that he's clean.

21   Q    And is there -- on C-006, do you also then talk about how

22   old she is?

23   A    Yes, I do.  I said that she's going to be 13 years old next

24   month.

25   Q    Now, we've already mentioned this, but at this point, you

1    still do not know who he is, correct?

2    A    Correct.

3    Q    And through the course of these first few messages, you've

4    talked about a price of the sexual activity, correct?

5    A    Yes.

6    Q    And you've talked about where it may occur, Eau Claire at a

7    hotel or something like that, correct?

8    A    Right.

9    Q    You've indicated Gracie's age to him as being 13 -- or,

10   yeah, 13 next month; is that right?

11   A    Correct.

12   Q    During any of these conversations, did the defendant give

13   to you any indication that he had any reservations about what

14   you guys were talking about or did he ever -- well, did he have

15   any reservations?

16              MR. BUGNI:  Your Honor, I'm going to object to form.

17              THE COURT:  What's the form problem?

18              MR. BUGNI:  Well, part of it, we don't know what

19   conversations exactly.  Are we limited to the first four pages

20   right now?  Are we asking in the entire --

21              THE COURT:  It's vague.  I'll sustain that.  Specify

22   the range that you're talking about.

23   BY MS. ALTMAN:

24   Q    Well, I thought I said that up to this date, but if not, up

25   to this date, up to August 21st, page C-007, had there been any

1    indication that he wasn't -- any reservations about what you

2    were talking about?

3    A    No.  In fact, I would argue the opposite.  Every time,

4    again, I tried to put up those kind of hurdles for him to

5    overcome, he would assure me that it wouldn't be an issue.

6          THE COURT:  Clarify this for me:  I think ultimately

7    we're going to get to three, four packages of communication,

8    maybe I've miscounted, but several packages of communication.

9    Is there any other communication with the defendant other than

10   what is presented in the exhibits that I have?

11          THE WITNESS:  No.

12          MS. ALTMAN:  No.

13          THE COURT:  So I have the whole universe.  So there's

14   not some other back channel where maybe he's equivocating or

15   expressing reservations or saying other things.  I have

16   everything.

17          THE WITNESS:  Yes.

18          THE COURT:  Okay.

19   BY MS. ALTMAN:

20   Q    If I could have you look at page C-007.  The defendant asks

21   about "grooming."  What was your response to that?

22   A    So my interpretation of what "grooming" meant, as said in

23   this context, I interpret it as child grooming, so, I mean,

24   child grooming would be the act of an adult basically developing

25   some type of relationship with the child over a period of time.

WADE BEARDSLEY - DIRECT

1    It can be multiple weeks, several months, up to years in some

2    cases where they develop an emotional bond with each other to

3    the point where the adult takes advantage of that relationship

4    to the point where it develops into a sexual relationship.  So

5    that's how I interpreted what "training" meant, and so my

6    response to his question in terms of how did I go about

7    grooming, I told him that I started Gracie at a very young age

8    and that she also associates it with play time.

9    Q    And if I could have you look at page C-008.  You ask "If

10   you have anything to offer besides cash, I would consider."

11   What were you asking about there?

12   A    Right.  Well, prior to that, he asked a question about if

13   there's any tips to ease into it.  He asked "Like how did you

14   engage her into it?"  And at that point I asked him if he had

15   something else to offer besides cash because I wasn't sure if he

16   perhaps had access to a child, so I was trying to identify if he

17   did, in fact, have access to a child by asking that question.

18   Q    And at some point then after that, did you -- did he ask to

19   move to a more secure email account?

20   A    Yeah, he did.

21   Q    And did that occur?

22   A    It did.

23   Q    Did -- what sort of account then did you set up?

24   A    Right.  So I used an encrypted email service called

25   Secmail.pro, and then he used one called ProtonMail.

1    Q   If I could have you take a look at the D -- Exhibits D just

2    generally?

3          THE COURT:  And could you just -- what was the secure

4    email server that you used?

5          THE WITNESS:  That I used was Secmail.pro.

6          THE COURT:  How do you spell that?

7          THE WITNESS:  S-E-C-M-A-I-L dot pro, P-R-O.

8          THE COURT:  Secmail.  Okay.  All right.

9    BY MS. ALTMAN:

10    Q   So just generally, what is Exhibit D?

11    A   Exhibit D are email communications over these encrypted

12    email services between myself and the defendant.

13    Q   It looks like they're from someone called

14    Ch3r0n@proton.mail.  Are all of these communications either to

15    or from that email address?

16    A   Yes.

17    Q   And what's ProtonMail?

18    A   ProtonMail is just the encrypted email service that the

19    defendant was using.

20    Q   And are you then amandah.pearson83@secmail?

21    A   Correct.

22    Q   How do you know that the "Ch" -- well, let me ask you this:

23    Do you still believe that the person with the protonmail.com is

24    the Roger Smith ghost.gmail.com?  Do you believe that they're

25    the same person?

1    A    Yeah, and it's because the only person that I ever provided

2    that Secmail.pro email address to was the defendant.

3    Q    If I could have you look at page D-003.  What's he asking

4    for in that -- on that page?

5    A    He's looking for some kind of validation, making sure that

6    I am who I claim to be.  So he's asking if we could either

7    Facetime or somehow verify my identity before the trip, and he

8    also mentions that he was thinking about doing a Saturday trip,

9    so sometime in a weekend.

10   Q    And then if you look at page D-006, the bottom of the page,

11   is that your message?

12   A    Yes, it is.

13   Q    And you're talking about wanting to Facetime with his

14   [verbatim] daughter, correct?

15   A    Correct.

16   Q    And why are you -- why are you responding with that

17   message?

18   A    Again, this is another out that I'm trying to give him.

19   I'm basically saying that, look, if -- first off, I tell him

20   that I'm not going to Facetime with him.  I'm not going to

21   provide him any pictures of my face or Gracie's face and that if

22   he's not comfortable with that, he can simply move on.

23   Q    If I could have you look at --

24        THE COURT:  Just to clarify -- I'm not sure I

25   understand -- did he ask to Facetime Gracie?

1          THE WITNESS:  Let's see.  I just want to make sure

2     specifically what --

3          MR. BUGNI:  D-003.

4          THE WITNESS:  Thank you.  He just says, "I would like

5     to do a Facetime or something to verify before I come" so --

6          THE COURT:  Doesn't say Gracie.

7          THE WITNESS:  No, it doesn't.

8          THE COURT:  Okay.  All right.  Go ahead.

9     BY MS. ALTMAN:

10    Q    If I could have you look at page D-008.  What's going on on

11    these pages here?

12    A    We're still kind of trying to figure out some of the

13    logistics in terms of when we can both meet up on the future

14    weekends that we've been kind of discussing, so he mentions "I

15    was thinking the weekend of the 10th if that works?"  And he

16    also asks if -- when she starts school.

17    Q    If I could have you look at page D-10 -- or, I'm sorry,

18    yeah, D-10.  Do you again reference her being 12?

19    A    Yes, I do.

20    Q    If I could have you look at page D-12.  What are you

21    talking about on these messages?

22    A    We're talking about sexual contact with Gracie, so he's

23    saying that he's more of a giver than a receiver, and he says

24    that he would want to do her on top and her from behind, and he

25    also mentions that he can "do several shots in an hour," and I

1    interpreted that as him being able to ejaculate several times in

2    an hour, and he says he does want to do oral, vaginal, and anal

3    sex.  Correction.  He only says I want to do oral, vaginal, and

4    anal.

5    Q    Now, if I could have you look at page D-16.  There's some

6    links there.  What were those links to?

7    A    These links were to princess-style dresses that he was

8    interested in purchasing for Gracie.

9    Q    And he says, "If I got her something like this, would she

10   wear it?"  Is that right?

11   A    Correct.

12   Q    And on page 017, do you respond to that?

13   A    Yeah.  I said I would be on the lookout -- or correction.

14   Hold on one second here.  Yeah.  I said that she would love

15   something like that, and then I provided him some measurements

16   that might fit Gracie.

17           MR. BUGNI:  Judge, can I have a moment with Ms. Altman?

18           THE COURT:  Yes.

19        (Discussion held off the record between counsel.)

20   BY MS. ALTMAN:

21   Q    If I could have you look at page D-29.  What's he asking

22   you about on that page?

23   A    He's asking whether or not I would prefer cash or crypto.

24   Q    Do you know what crypto is?

25   A    Yeah.  It's a cryptocurrency.  It's a form of payment that

1    you can send to people anonymously online.

2    Q    Now, if I could have you take a look at page D-31.  Is that

3    top message from the defendant or who you -- yes, the person who

4    you subsequently identified as the defendant?

5         MR. BUGNI:  We agree it's the defendant, Your Honor.

6         THE COURT:  Okay.

7         THE WITNESS:  Yes.

8    BY MS. ALTMAN:

9    Q    Okay.  And what's he asking in that top message?

10   A    He's offering to see if -- one second.  He's offering to

11   send some money ahead of the meet-up, and then also he's also

12   asking if she, referring to Gracie, can do a video for the

13   defendant as well.

14   Q    What's your response to that on page D-032?

15   A    I tell him again that I'm not willing to send any type of

16   video of Gracie to the defendant, and I'm just -- I said that I

17   hoped that he can understand.

18   Q    If I could have you go to page D-037.  He asks about "And

19   unrestricted?  Like whatever I want?"  What did you understand

20   him to be talking about?

21   A    I interpreted that as sexual in nature.

22   Q    And what was your response to what he was asking about?

23   A    I tell him that if he wanted unconditional access for one

24   day, it would be a thousand; two days, it would be 1,500.

25   Q    And if you look at page then D-038, he then asks you about

──────WADE BEARDSLEY - DIRECT──────

1    photos or recording, correct?

2    A    Right.

3    Q    Now, let's jump ahead a little bit.  Ultimately, the

4    defendant arrived in Eau Claire, correct?

5    A    He did.

6    Q    And if I could have you look at Exhibits P-1 in front of

7    you, the actual physical exhibits that are in front of you.

8    A    Oh.

9    Q    P-1 and P-2, what are those?

10   A    Those are the recording devices the defendant brought with

11   him to Eau Claire.

12   Q    And what's in that packet that you're opening?

13   A    They are two GoPro-style cameras and a scene light as well,

14   so these are the GoPro-style cameras here, and then this is a

15   scene light with what appears to be some kind of head attachment

16   or strap with it as well and then some miscellaneous

17   accessories.

18   Q    And where was that found?

19   A    This was found in his backpack.

20   Q    And if I could have you take a look at P-3, what is that?

21   A    This is the handheld camera that he brought with him as

22   well.

23   Q    During the course of your interview, so I guess jumping

24   ahead --

25              THE COURT:  Okay.  And that one is a camcorder, right?

WADE BEARDSLEY – DIRECT

1            THE WITNESS:  Yeah, yep.

2      BY MS. ALTMAN:

3      Q    During the course of your interview, did you ask him about

4      these items?

5      A    I did, yes.

6      Q    And did he indicate to you at least one of the purposes for

7      bringing them?

8      A    Yes, he did.

9      Q    And what did he say that was?

10     A    He told me one of the purposes was for the sexual assaults

11     with Gracie.

12     Q    To record them?

13     A    Correct.

14     Q    So if I could have you look at page D-043.  What does he

15     say in that first message, the top of the page?

16     A    He says, "Yeah, definitely, and Gracie, not Tracie, LOL.

17     Is she nervous about meeting or have you not told her?"

18     Q    And then if I could have you look at the next page.  Does

19     he indicate -- well, the bottom part of that message, the top

20     message from him, what does he say that he wants the interaction

21     to be?

22     A    He wants the interaction to be, I guess, mutually

23     beneficial.  He says, "What was her reaction when you told her?

24     Because I want her to want this.  Otherwise it won't be

25     enjoyable for either party."

─────WADE BEARDSLEY – DIRECT─────

1   Q    If I could have you look at D-048.  What's he asking about

2   there?

3   A    He's asking whether or not Gracie wears bras yet.

4   Q    What was your response just generally in the next couple

5   pages?

6   A    I told him that she really didn't besides training bras.

7   Q    And did you tell him -- what did you tell him about whether

8   or not he could bring bras to her or not?

9   A    Well, he asked if she would be interested in starting some

10  kind of collection.

11  Q    And what was your response?

12  A    I said he could.

13  Q    If I could have you look at page D-050.

14          THE COURT:  Can I ask a question about D-48?

15          MS. ALTMAN:  Sure.

16          THE COURT:  Is that redacted or -- most of them have a

17  communication from the detective and then a communication from

18  the defendant.  That just has the defendant's communication.  It

19  looks like it's a little cut-off.  Is there more to that one

20  or --

21          MS. ALTMAN:  It was not redacted, Your Honor.  That was

22  the way it came.

23          MR. BUGNI:  That's the way it is in discovery as well.

24          THE COURT:  Okay.  All right.  Okay.  Go ahead.

25  BY MS. ALTMAN:

————WADE BEARDSLEY – DIRECT————

1   Q   So turning back to D-050, you indicate "she would be super

2   interested, especially if you introduced them to her," correct?

3   A   Correct.

4   Q   All right.  So if I could have you take a look at

5   Exhibit -- first the R -- Exhibit R but the R that's the manila

6   envelope.  I think there's two Rs in front of you.  The other --

7   yeah, that one.  That's not the manila envelope.

8   A   This one?

9   Q   Yes.

10  A   Okay.

11  Q   It's Exhibit R.  What's in there?

12  A   So this is the training bra that he brought with.

13  Q   Was there another one as well?

14  A   Yes, there was.

15  Q   And where were those found?

16  A   This was also found in his backpack.

17  Q   If I could have you look at D-006 [verbatim].  It looks

18  like he's asking you about a price for the weekend; is that

19  right?  And you tell him that it's $1,500?

20          THE COURT:  I'm not sure we're on the right page.  Is

21  it D-60?

22          MS. ALTMAN:  D-066.

23          THE WITNESS:  D-60?

24          MS. ALTMAN:  66.

25          THE WITNESS:  I'm sorry.  Can you repeat the question?

WADE BEARDSLEY - DIRECT

```
 1    BY MS. ALTMAN:
 2    Q    Sure.  What do you tell him when you tell him "I think
 3    $1,500 is fair"?  What are you charging him $1,500 for?
 4    A    For the weekend.
 5    Q    And what's his response?
 6    A    On D-060?
 7    Q    066.
 8         MR. BUGNI:  It's at the top, I believe.
 9         THE WITNESS:  Okay.  He said he'd have about half of
10    that, and he's asking -- he would assume that everything would
11    need to be upfront in terms of cash.
12    BY MS. ALTMAN:
13    Q    Now, during this time while you were chatting on the secure
14    platform, where you were both, I guess, on the secure platforms,
15    were you also sometimes communicating, you yourself, through
16    your Gmail platform?
17    A    Correct.  There was a little bit of overlap.
18    Q    And why was that?
19    A    Initially when we were trying to establish the
20    communication on the encrypted email services, there was some
21    delay, and we weren't really sure if it was working, so there
22    was just a little bit of overlap.
23    Q    And if I could have you look at Exhibit E just generally,
24    are those more Gmail or they at least have a Gmail heading on
25    them, correct?
```

1    A    Right.

2    Q    And it looks like these emails are from that same Proton

3    email account, the "Ch" from the defendant, correct?

4    A    Correct.

5    Q    But on these now, this set of emails here, are you --

6    you're using your Google account again?

7    A    Yeah.  And as you can see under where this message that the

8    defendant sent this to, he sent it to both the Secmail.pro email

9    account and then also my Gmail account.  So, again, we were just

10   having some communication issues.

11   Q    Okay.  And then why did you start communicating on your --

12   through your Gmail accounts?

13   A    It was a lot easier to read the messages.  As you can kind

14   of see from the other exhibits with the secure email

15   conversation, it's just easier to read the messages.

16   Q    So if I could have you look then at page E-004.  This is an

17   email from you to the defendant asking about proof of a ticket,

18   correct?

19   A    Correct.

20   Q    What are you asking for?

21   A    I'm asking if he would just be willing to send some kind of

22   verification that he's going to purchase a ticket.

23   Q    Had he indicated to you that he had actually purchased a

24   ticket at some point?

25   A    Yes, he did.

1    Q    Now, at this point, you still did not -- did you know who

2    he was?

3    A    Up to this point, no, I didn't.

4    Q    If I could have you -- you asked him for proof of a ticket,

5    correct?

6    A    Correct.

7    Q    If I could have you look at Exhibit N, please.  What is

8    that?

9    A    This is the redacted flight itinerary that the defendant

10   sent me.

11   Q    Can you just go through it a little bit, please?

12   A    Yeah.

13        MR. BUGNI:  Your Honor, it says what it says.

14        THE COURT:  Yeah.  Is there anything that you want to

15   point -- I think I know where we're going with this.

16        MS. ALTMAN:  I mean, this is how he identified the

17   defendant ultimately --

18        THE COURT:  Yeah.  So he got this -- it didn't tell his

19   name, but from this, he was able to take another step.  So why

20   don't you just tell me what he did with it.

21   BY MS. ALTMAN:

22   Q    What did you do with this information?

23   A    After I identified the airline that the itinerary came

24   from, which was Frontier, I contacted Frontier's security

25   division, and I provided them this redacted flight itinerary,

1    and they were able to identify who the -- who the person -- who

2    the customer was, and it was -- they ultimately provided me the

3    name of Robert Hosler.

4    Q    And were you also able then to determine his date of birth?

5    A    Yes, I was.

6    Q    What was that?

7    A    September 17th of 1991.

8    Q    If I could have you just look at Exhibit I then.  What is

9    that?

10   A    This is the flight itinerary that was located in his car,

11   the unredacted flight itinerary.

12   Q    If I could have you look at page E-006.  The first message

13   from the defendant, it provides a phone number.  Is that a

14   number that you ultimately began communicating with him on?

15   A    Yes.  Shortly hereafter, we began communicating via text

16   through this phone number.

17   Q    And then what's the next message right after that one with

18   the phone number?

19   A    He says, "But I can't wait to finally meet.  Did you let

20   her know that I'm coming?"

21   Q    And then what was your response to that?

22   A    I said, "Yeah, no kidding.  This has been such a long time

23   in the making.  I was honestly a little skeptical if you were

24   going to follow through.  I haven't told her yet.  Probably will

25   do that tonight."

1    Q    And did he indicate then that he wanted to chat or email

2    with her himself?

3    A    Yes, he does.

4    Q    If I could have you flip to page 007 -- I'm sorry, E-007.

5    There's a chat or a message from him about scheduling an

6    appointment.  What did that have to deal with?

7    A    This is related to scheduling a test to be tested for

8    sexually transmitted diseases.

9    Q    If I could have you take a look at -- well, let me ask you

10   this:  At some point during these communications further out,

11   did he indicate to you that he had, in fact, been tested for

12   STDs?

13   A    He did.

14   Q    And did he send you results?

15   A    He did.

16   Q    If I could have you -- or what he purported to be results?

17   A    Correct.

18   Q    If I could have you take a look at Exhibit L.  What is

19   that?

20   A    That's the redacted STD results that he sent me, the first

21   one.

22   Q    What did you do after getting that result?

23   A    I noticed that the date that the exam was taken was

24   redacted, and so I asked if he would send me an unredacted copy

25   just showing when the date he got the test done, and I did this

1    because again --

2              MR. BUGNI:  Objection, Your Honor.  Nonresponsive and

3    not relevant.

4              THE COURT:  Well, the responsive objection would be Ms.

5    Altman's, but the relevance --

6              MR. BUGNI:  Goes beyond the scope of the question and

7    relevance.

8              THE COURT:  Okay.  And -- what was the question?  What

9    did you do after getting the results?  I'm kind of lost.

10             MS. ALTMAN:  Yeah.  I can ask questions.

11   BY MS. ALTMAN:

12   Q    So what -- what did you do after receiving this result?

13   A    So I noticed that the date that the exam was conducted was

14   redacted.

15   Q    So what did you do --

16             MR. BUGNI:  Objection.  Relevance.  The relevance to

17   this -- we've already established it's him.  What does this bear

18   on any element that's contested right now?

19             MS. ALTMAN:  Well, it goes to his intent, Your Honor,

20   that he's jumping through all of these hoops that the defendant

21   [verbatim] is showing -- giving him to come and meet his child

22   and have sexual contact with this child.

23             MR. BUGNI:  He flew there.

24             THE COURT:  All right.  I'll overrule it.  Go ahead.

25   I'm not sure what the detail -- what the additional details are

1   going to show.  I mean, I think I get the trajectory of the

2   story, but go ahead.  I'll overrule it.  Go ahead and tell me

3   what you want to tell me about what he did after he got this

4   test with the redacted date.

5   BY MS. ALTMAN:

6   Q    Well, what's Exhibit M?  If I could have you take a look at

7   Exhibit M, please.

8   A    That's the second STD result he sent me via email, and part

9   of this exhibit is that the date that the exam was conducted was

10  unredacted, so he provided me one that was unredacted.

11  Q    Now, jumping ahead again briefly to his interview, did

12  he -- what did he say about whether or not he sent these STD

13  results?

14  A    He did eventually admit to sending these results.

15  Q    Did he indicate to you whether they were real or not?

16          MR. BUGNI:  Objection.  Relevance.

17          THE COURT:  Overruled.

18          THE WITNESS:  He said that they were not real.

19  BY MS. ALTMAN:

20  Q    Now, toward the bottom -- if I could have you go back to

21  E-007 -- there's a screenshot of a shopping bag there, correct?

22  A    Correct.

23  Q    And if you could look at Exhibit K, what is that?

24  A    That's the defendant's Amazon.com shopping cart.

25  Q    Is that a blow-up of the message on E-007?

─────WADE BEARDSLEY - DIRECT─────

```
1    A    Correct.

2    Q    Now, what was -- why did he send you this -- what was the

3    conversation that led up to him sending you this shopping bag

4    picture?

5    A    Right.  So he told me that he was going to be purchasing

6    these items for Gracie.

7    Q    And if I could have you look at Exhibit Q, please, in one

8    of the bags.  And what is that?

9    A    This is the top item on the Amazon.com shopping cart.

10   Q    Where was that found?

11   A    That was found -- that was also found in his backpack when

12   he was taken into custody.

13   Q    Did you ask him about that dress when you interviewed him?

14   A    Yes, I did.

15   Q    What did he first say about it?

16        MR. BUGNI:  Objection.  Relevance, Your Honor.  It's

17   become cumulative.

18        THE COURT:  Overruled.  Go ahead.

19        THE WITNESS:  He initially told me that he was not

20   aware of the existence of the dress in the backpack.

21   BY MS. ALTMAN:

22   Q    How could -- what was his explanation for that?

23   A    He told me that he had gotten his backpack from a friend of

24   his and he didn't check it before boarding his flight.

25   Q    Did he ultimately admit to you that he had purchased it for
```

WADE BEARDSLEY - DIRECT

1    the fictitious 12-year-old?

2    A    Yes, he did.

3    Q    If I could have you look at Exhibit Q, please.  Oh, I'm

4    kidding.  R, please.  And what are those items?

5         MR. BUGNI:  Your Honor, I'm going to object again on

6    cumulative and also relevance.

7         THE COURT:  Overruled.  Go ahead.

8         THE WITNESS:  So these are the other items from the

9    Amazon.com shopping cart.  That was the swimming suit that he

10   had and then also the children's underwear that he also had as

11   well.

12   BY MS. ALTMAN:

13   Q    Okay.  And where were those found?

14   A    They were found in his backpack, the defendant's backpack.

15   Q    And then again jumping ahead to his interview, was he asked

16   about the underwear?

17   A    Yes, he was.

18   Q    And what was his first story about the underwear?

19   A    He initially told us that the underwear belonged to his

20   girlfriend.

21   Q    And did he later admit that he bought them for the --

22   Gracie?

23   A    Yes, he did.

24   Q    If I could have you look now at page E-009.  Second message

25   from the bottom, what is he telling you there?

WADE BEARDSLEY - DIRECT

1    A    He's asking me to tell Gracie and to let me know -- to tell

2    him what her reaction was.

3    Q    And what was that in regards to?

4    A    The dress and some of the other items.

5    Q    And then if you look on page E-010, does he again ask you

6    "Did you tell her?"  The middle of the page.

7    A    Correct.

8    Q    And what was your response?

9    A    I indicated that I did tell her.

10   Q    If I could have you look at page E-017.  Through the course

11   of these chats, was there a plan developed as to how he would

12   get from Minneapolis to Eau Claire?

13   A    Yes, there was.

14   Q    And what was -- what did the plan ultimately turn out to

15   be?

16   A    The plan was for him to fly into the Minneapolis-St. Paul

17   airport.  He would rent a vehicle at the airport and then meet

18   myself and Gracie at a park called McDonough Park in the City of

19   Eau Claire, which is located at 800 Center Street.

20   Q    And if I could -- is that in Eau Claire?  I'm sorry.

21   A    Yes, it is.

22        MS. ALTMAN:  Judge, I'd ask the Court to take judicial

23   notice that Eau Claire is in the Western District.

24        THE COURT:  I will notice that.

25   BY MS. ALTMAN:

WADE BEARDSLEY - DIRECT

1    Q    If I could have you look at Exhibit J, please.  Do you have

2    a hard copy of that in front of you --

3    A    Yeah, I'm looking for that.

4    Q    -- somewhere?  Even, yeah, looking at the screen --

5    A    It's underneath here.

6    Q    So what is that?

7    A    These are the documents related to his rental vehicle that

8    were located in the car when he was arrested.

9    Q    Now, at some point, I think you indicated that you -- well,

10   let me ask you this:  Could you take a look at Exhibit F,

11   please?  These appear to be a continuation of the previous

12   emails, correct?

13   A    Correct.

14   Q    They're from Ch3, the defendant, to your Gmail account; is

15   that right?

16   A    Right.

17   Q    And that first email says "I'll have at least five to six."

18   What were you guys talking about before this message?  What was

19   the five to six?

20   A    Five to six is how much money he'd be bringing with.  So

21   five to $600.

22   Q    If I could have you take a look at Exhibit O, please.  What

23   is that?

24   A    That is the amount of money that he brought with him when

25   he was ultimately arrested, which is approximately $520.

1    Q    If I could have you look at page F-003.  What's going on in

2    these messages?

3    A    We're just trying to figure out some of the logistics and

4    what Gracie's going to be wearing at the date and time when we

5    actually meet at McDonough Park so he can identify us.

6    Q    And if you look at page F-004, does he indicate what he

7    wants to see her in?

8    A    He prefers something cute and sexy.

9    Q    If I could have you take a look at page F-009, please.

10   What are these chats talking about?

11   A    We're just talking about what he's going to be doing once

12   he arrives in Eau Claire, his time spent with Gracie, et cetera.

13   Q    And in the second message, it looks like you say, "She is

14   just so excited to finally meet you on Thursday"; is that right?

15   A    Correct.

16   Q    And what's his response to that?

17   A    He says, "The feeling is mutual."

18   Q    He says, "Well, tell her the feeling is mutual"?

19   A    Correct.  "Well, tell her the feeling is mutual."

20   Q    And what does he ask then also?

21   A    Did she pick a place for Thursday.

22   Q    And what was Thursday?

23   A    Thursday would be the meet-up time.

24   Q    That he was coming to Eau Claire?

25   A    Correct.

WADE BEARDSLEY - DIRECT

1    Q    If I could have you look to page F-017.  At the very bottom

2    of that chat or that page, what does he ask you to do?

3    A    He's asking if I would give Gracie a hug for him and that

4    he can't wait to meet.

5    Q    Now, I think that you indicated that at some point you

6    began texting with the defendant, correct?

7    A    Correct.

8    Q    If I could have you look at Exhibit H just in the binder.

9    What are those?

10   A    These are the text messages between myself and the

11   defendant.

12   Q    And it looks like one of the participants is identified as

13   greg2.walters.  Who's that?

14   A    That's me.  It's from a previous undercover account.  It

15   has no bearing on the case, and he never saw that name when we

16   were texting back and forth.  It's just a name that popped up

17   during the extraction process.

18   Q    And this 440 number, what number is that?

19   A    That is the defendant's number that he provided me in a

20   previous email.

21   Q    And it looks like these chats start on September 3rd of

22   2018; is that right?

23   A    Correct.

24   Q    We're going to skip through quite a bit of these.  If I

25   could have you take a look at page H-033.  Is there some

1    conversation about her drinking?

2    A    Yes, there is.

3    Q    And what's the nature of the conversation?

4    A    He's basically just inquiring about her drinking habits.

5    He's just asking how much and how often and if she's a social

6    drinker.

7    Q    And what's your response?

8    A    "Maybe once a week or so" is what I say.

9    Q    And does he offer to get her some then?

10   A    Yeah.  At the bottom here it says, "Okay.  When I get

11   there, I can go to a store and pick some up."

12   Q    And if you go to page H-034, what's the first blue

13   message -- the blue is him, correct?

14   A    Correct.

15   Q    And what's the first blue message?

16   A    "What has she told you about meeting?  Other than being

17   excited."

18   Q    And what's his next response?

19   A    "I hope to.  I don't want this to be just physical or

20   anything like that."

21   Q    And then one more?

22   A    "I want her to do it because she wants to, not because she

23   has to or is forced to."

24   Q    If I could have you look at page H-046.  The bottom message

25   from him says "What are things that are and are not okay?"  And

1    if you look at page H-047, what is your response to that?

2    A    I tell him that "Choking is off limits."

3    Q    And what's his response?

4    A    He says, "Okay.  That sounds fair and smart.  That leaves

5    bruises."

6    Q    Was there anything else on page H-048 that was off limits?

7    A    Yeah.  I also said that I would prefer that he pull out,

8    which I'm referring to ejaculating.

9    Q    What was his response to that?

10   A    He asked if that's a hard request "because in the heat of

11   the moment, dot, dot, dot, but if that is what you want, I can

12   do that.  Either way we can get cleaned up right away" is what

13   he says.

14   Q    And did you indicate anything else was off limits?

15   A    No pain or torture, anything like that.

16   Q    Now, if you look on page H-049, the first blue message, it

17   indicates "What if we wanted to try backdoor?"  What did you

18   take that to mean?

19   A    I interpreted that as anal sex.

20   Q    And in that same message, it looks like he tells you the

21   flight is delayed, correct?

22   A    Correct.

23   Q    Was -- did you do anything to confirm whether or not that

24   was still true?

25   A    Yes, I did.  I looked up the flight number, and it was,

1    indeed, delayed about an hour.

2    Q    And then did he also let you know -- I'm looking at page

3    H-052 -- when he did finally get to Minneapolis?

4    A    Yeah.  He indicated that he had just landed.

5    Q    Now, let's talk about his arrival in Minneapolis.  Was he

6    under surveillance when he got off the plane?

7    A    Yes, he was.

8    Q    Can you explain that to me, please?

9    A    Right.  So as soon as he deboarded the plane, Homeland

10   Security Investigations took over surveillance.  As soon as he

11   got off, HSI took a picture of him and sent that photo to other

12   investigators who were in the case as well.

13   Q    How did they know who to look for?

14   A    Homeland Security was previously provided his name as well

15   as a photo of him.

16   Q    And so then they sent other investigators a picture,

17   correct?

18   A    Correct.

19   Q    Was that the defendant?

20   A    Yes, it was.

21   Q    And then what happened?

22   A    After he deboarded the plane, he walked through the ground

23   transportation area of the airport and ultimately National Car

24   Rental, where he proceeded to rent a vehicle.  Homeland Security

25   Investigations took a photo of the vehicle that he got into

WADE BEARDSLEY - DIRECT

1    along with the license plate as well.

2    Q    Did they continue to surveil him?

3    A    They did.  So as soon as he got in his vehicle and left the

4    airport, Wisconsin Department of Justice, Division of Criminal

5    Investigations, took over the mobile surveillance from the

6    airport all the way to the City of Eau Claire.

7    Q    And have you spoken to members of that surveillance unit?

8    A    I did, yes.

9    Q    And did they give you some indication of his speed?

10   A    Yes.  They told me he was driving in excess of 90 miles per

11   hour.

12   Q    Now, where did he first stop when he got to Eau Claire?

13   A    He stopped about a block or a block and a half away from

14   the designated meet-up point, which again was that McDonough

15   Park.

16   Q    Did he text you again at that point, looking at page H-054?

17   A    Yes, he did.

18   Q    And did you tell him where you were?

19   A    Yeah.  I told him that we were by the playground.

20   Q    And where did the defendant go at that point?

21   A    So after texting him that message, the defendant drove into

22   the parking lot of McDonough Park and was ultimately taken into

23   custody.

24   Q    If I could have you take a look at Exhibit S in front of

25   you.  What is that?

────WADE BEARDSLEY - DIRECT────

1    A    This is the cell phone that the defendant had in his

2    custody when he was arrested.

3    Q    Okay.  If you could look at the screen for Exhibit S1.  Can

4    you -- explain what that is, please.

5    A    Yep.  So it appears that he has Google navigation or GPS on

6    his cell phone, and it looks as though the destination is

7    McDonough Playground.

8    Q    And was that -- well, where did that come from?

9    A    That came from the defendant's cell phone.

10   Q    At the time he was arrested?

11   A    Correct.

12   Q    And all of the items we've already talked about, the

13   clothing, the mobile equipment, all those things were found in

14   his car at that time?

15   A    Right.

16   Q    Let's talk briefly about your conversation with him.  Did

17   you interview him after his arrest?

18   A    I did, yes.

19   Q    And did he indicate that he was on PalFinder?

20   A    He did.

21   Q    Okay.  And what did he say about the ad by Amanda, if

22   anything?

23   A    He knew what ad I was referring to.  He was familiar with

24   the ad.

25   Q    Did he indicate whether or not he answered it?

WADE BEARDSLEY - DIRECT

1    A    Yes, he did.  He indicated that he did answer it.

2    Q    Did he indicate to you whether or not he knew the age of

3    the child that was being discussed when you were asking him

4    about that child?

5    A    He did.  He advised the child that was being discussed was

6    12 years old.

7    Q    Did he ultimately let you take over some of his accounts?

8    A    He did.

9    Q    Okay.  And what did that show you or what did you learn

10    from that?

11    A    So he gave me consent to take --

12            MR. BUGNI:  Your Honor, we object to relevance.

13            MS. ALTMAN:  It's going to identify the defendant, Your

14    Honor.

15            THE COURT:  Okay.  Overruled.  Go ahead.

16            THE WITNESS:  Yes.  He provided me the login

17    credentials to his encrypted email service using the ProtonMail

18    email service that he used.

19    BY MS. ALTMAN:

20    Q    And that was the same one that had been communicating with

21    you in the -- when you were acting in the undercover capacity?

22    A    Correct.

23            MS. ALTMAN:  I have nothing further.

24            THE COURT:  Okay.  Cross-examination.

25            MR. BUGNI:  Judge, can we take just a brief recess?

```
 1              THE COURT:  I was going to say, it's 11:00 now.  We've

 2     been going about a couple hours.  Let's reconvene at ten after

 3     11:00.

 4              THE CLERK:  This court stands in recess.

 5          (Recess at 10:57 a.m. until 11:11 a.m.)

 6              THE COURT:  All right.  I'm going to have a couple

 7     questions, but I'll ask them after --

 8              MR. BUGNI:  No, no --

 9              THE COURT:  That way you can address them if you want

10     to during the cross-examination.  Okay.  First question about

11     the interview:  Is there a transcript or recording of the

12     interview?

13              THE WITNESS:  Yes, there is.

14              THE COURT:  Okay.  I have one question about one

15     particular -- and I guess you could show me word for word if you

16     want, but I doubt that Mr. Hosler said that his purpose was to

17     record the sexual abuse of Gracie, and so I'm wondering how did

18     he articulate that -- I'd like a closer paraphrase or the

19     transcript of what he said about that.

20              MS. ALTMAN:  It's on page -- it's on page 133.  This is

21     Mr. Bugni's transcript.  If he doesn't mind, I'll just --

22              MR. BUGNI:  No, no.  Go for it.

23              MS. ALTMAN:  Pardon me?

24              MR. BUGNI:  Go for it.

25              MS. ALTMAN:  The question is -- let's see.  Where does
```

1    it start?  On page 135:

2        "Question:  Did you want to be behind the camera?

3        "Answer:  No.  I want to know what these people were going

4    through, I guess, because I have the same tendencies and ideas

5    and feelings.  I just don't know how to act on them.  I don't

6    know what to do.

7        "Question:  Did you mention that you were going to bring

8    video equipment to film the assaults?

9        "Yes, I did.

10        "Question:  Okay.  And I assume that was what the GoPro was

11    for?

12        "Answer:  Yes, that was one of the purposes of the GoPro,"

13    and it goes on to exculpatory information, but that was the

14    admission.

15            THE COURT:  Okay.  All right.  So, Mr. Bugni, do I need

16    to hear any more of that?

17            MR. BUGNI:  No.

18            THE COURT:  Okay.  All right.  Okay.  The second

19    question I have is kind of about the overall trajectory of this

20    investigation.  So I gather you posted this ad that's kind of in

21    the realm of what's available on PalFinder, but then it's a

22    lengthy, lengthy communication that you have with the defendant,

23    and so do you just improvise that as you go?  Do you have a

24    plan?  Is there an overall outline of what the -- how you're

25    supposed to do this?  I'm just interested in how you structured

1     your interactions with the defendant.

2             THE WITNESS:  Right.  And that kind of comes back to

3     the undercover chat investigation school that I've attended too.

4     We try to have the defendant set the tone and pace of the

5     conversation and, you know, yeah, a lot of it is just kind of

6     having the conversations kind of come up as fluidly and as

7     normally, I guess, as possible.

8             THE COURT:  Uh-huh.  All right.  And so do you have in

9     mind certain -- the elements of a crime that you're seeking to

10    establish through the communications at the time you're doing

11    the investigation?

12            THE WITNESS:  Right.  So we'll try to -- you know,

13    there are things that we avoid doing such as we try to avoid

14    bringing up sex until the defendant brings up sex.  We won't

15    discuss meeting up in person until the defendant brings up

16    meeting up in person, and, again, that just kind of goes back to

17    having the defendant kind of setting the tone and pace of that

18    conversation.

19            THE COURT:  All right.  And then is the overall

20    proposal here, is this consistent or what you would expect to

21    see on PalFinder?  Is this kind of activity -- I mean, it's not

22    at all normal to most people.

23            THE WITNESS:  Yeah.

24            THE COURT:  But is it normalized in the environment of

25    PalFinder?  Are these the kind of things that people propose or

1    offer?

2            THE WITNESS:  It's almost exclusively for the buying

3    and selling and renting of children for sex or people that are

4    posting ads that are trying to seek that out.

5            THE COURT:  Uh-huh.

6            THE WITNESS:  So, yeah, I mean, that's the whole kind

7    of the -- you know, again, the description of PalFinder,

8    according to the website, was kind of vague on what they were

9    advertising, but if you could see the people -- the ads that

10   people were actually posting, that's all it was.

11           THE COURT:  Uh-huh.  And although you say that you

12   didn't propose sex until the defendant suggested it --

13           THE WITNESS:  Uh-huh.

14           THE COURT:  -- the whole ad proposes to swap a

15   13-year-old --

16           THE WITNESS:  Right.

17           THE COURT:  -- so that seems to be -- that's a sexual

18   invitation right from the beginning if not -- it's so obviously

19   the implication of it.

20           THE WITNESS:  Right.  But they would have -- yeah, but,

21   I mean --

22           THE COURT:  It doesn't literally say anything about sex

23   but --

24           THE WITNESS:  It's mostly the conversation that you

25   have after they respond to that ad looking to -- the defendant

1    is clearly trying to seek something out in that ad or maybe they

2    have some additional questions, and then it kind of -- then the

3    conversation between he and I, again, it kind of goes towards,

4    you know, what -- the questions the defendant has about the ad

5    or what they're looking for specifically.

6              THE COURT:  All right.  Okay.  Thank you.

7         All right.  Mr. Bugni.

8                        CROSS-EXAMINATION

9    BY MR. BUGNI:

10   Q    Agent Beardsley, it's pretty relaxed here, as you can tell,

11   so I'm going to actually follow up with many of the judge's

12   questions first, but I just want to lay a little bit of

13   foundation.  So you're an Eau Claire detective, correct?

14   A    Yes.

15   Q    All right.  So many of your cases are prosecuted state

16   side?

17   A    Correct.

18   Q    But you do have some occasionally in federal court?

19   A    This is my first one.

20   Q    Oh, this is your first one.  All right.  Well, but they do

21   discuss federal court and federal investigations in some of your

22   trainings?

23   A    Yes.

24   Q    Okay.  And you've been to many trainings, correct?

25   A    Correct.

1    Q    All right.  You've been to training in Florida?

2    A    Yes, I have.

3    Q    Florida -- training in Georgia?

4    A    Correct.

5    Q    And part of your training was also the undercover chat

6    school, correct?

7    A    Yes.

8    Q    All right.  And that's where you learn all these

9    techniques.

10   A    Yes.

11   Q    All right.  And they teach you there the behavior that

12   you're supposed to engage in, correct?

13   A    Yes.

14   Q    All right.  You don't want to entrap somebody?

15   A    Correct.

16   Q    All right.  And you also want to make sure that what you do

17   as part of your sting actually violates the law.

18   A    Correct.

19   Q    And here I'd like to ask you some questions about this

20   particular sting, all right?  You went on the dark web, correct?

21   A    Yes.

22   Q    Went on the website PalFinder?

23   A    Right.

24   Q    You posted this advertisement?

25   A    Correct.

1    Q    And following up on the judge's question, this was really

2    your story line.

3    A    Yes, initially, yes.

4    Q    You were advertising your daughter?

5    A    Yes.

6    Q    All right.  And you could have chosen to be the father?

7    A    Correct.

8    Q    Could have been that you were advertising your son?

9    A    Yes.

10   Q    Could have been that you were advertising a 17-year-old?

11   A    Yes.

12   Q    Or a 17-month-old?

13   A    Right.

14   Q    All right.  And you could have advertised a virgin?

15   A    Correct.

16   Q    Or you could have advertised somebody who's sexually

17   experienced?

18   A    Yes.

19   Q    And you settled on this particular story line.

20   A    Yes.

21   Q    Okay.  All right.  You decided all the details that are

22   going to be communicated to Mr. Hosler?

23   A    Right.

24   Q    You decided the girl's age?

25   A    Yes.

```
1    Q    You decided that she'd be 12.

2    A    Yes.

3    Q    And you settled on her name.

4    A    Yes.

5    Q    All right.  You could have made her black?

6    A    Yes.

7    Q    You could have made the child Hispanic?

8    A    Yes.

9    Q    But you went with a white girl?

10   A    Yes.

11   Q    Okay.  And you also were able to decide where they were

12   from?

13   A    Yes.

14   Q    Could have been Minnesota?

15   A    Correct.

16   Q    Could have been Milwaukee?

17   A    Yes.

18   Q    But you settled on Eau Claire.

19   A    Right.

20   Q    All right.  And you also settled on other details in there.

21   You decided that the mom would have a boyfriend?

22   A    Correct.

23   Q    All right.  And in your story line, the mom would be broke?

24   A    (No response.)

25   Q    She would need money for rent?
```

WADE BEARDSLEY - CROSS

```
 1    A    Yes.
 2    Q    All right.  And part of the reason she was willing to sell
 3    her daughter was she needed money for rent?
 4    A    Yes.
 5    Q    Okay.  All right.  Now, those aren't just the small details
 6    of this story line that you created.  There were actually
 7    bigger, you know, foundational story points.  I'd like to ask
 8    you a couple questions about that.  This mom that you created,
 9    she was from a sexually progressive family?
10    A    Yes.
11    Q    All right?  You called it taboo, I believe?
12    A    Right.
13    Q    And she grew up in a family where most of her family
14    members, I guess, assaulted one another.
15    A    Correct.
16    Q    All right?  And that meant the mom was used to having sex
17    with older men.
18    A    Correct.
19    Q    And you also represented that when she had this daughter,
20    Gracie, it was just a natural progression.
21    A    Correct.
22    Q    All right?  Those were your words?
23    A    Yep, yes.
24    Q    And so the mom led the daughter into this life?
25    A    Yes.
```

```
1    Q    And this included the daughter having sex when she was just
2    2?
3    A    Correct.
4    Q    All right?  And your story started with the daughter
5    building up from there, correct?
6    A    Right.
7    Q    And she had had sex with various family members?
8    A    Yes.
9    Q    She had sex with her biological father?
10   A    Yes.
11   Q    Sex with the woman's boyfriend?
12   A    Yes.
13   Q    Sex with her uncles?
14   A    Yes.
15   Q    And even sex with her own mom?
16   A    Yes.
17   Q    All right?  And in your story line, there was vaginal sex?
18   A    Yes.
19   Q    The girl had had oral sex?
20   A    Yes.
21   Q    And the girl had had anal sex?
22   A    Yes.
23   Q    And that was all, again, the story line that you had
24   created.
25   A    Correct.
```

```
1    Q    And that was the story line that you presented to Mr.
2    Hosler?
3    A    Correct.
4    Q    All right.  And she enjoyed sex.
5    A    Who are you referring to?
6    Q    Gracie.
7    A    Yes.
8    Q    All right.  It was something that she had always done?
9    A    Correct.
10   Q    And as part of your grooming of her -- again, I know you
11   didn't groom her, but the representations of the mother, it was
12   a fun game?
13   A    Yes.
14   Q    All right?  It was like wrestling?
15   A    Yes.
16   Q    And it was horseplay?
17   A    Correct.
18   Q    And as part of your story line, the last time she had had
19   sex was three weeks ago?
20   A    Correct.
21   Q    All right?  And part of the reason you were advertising was
22   both mom needs money, but also Gracie was looking to sexually
23   explore outside of the mom and boyfriend.
24   A    That's correct.
25   Q    All right.  And in your story line, over time Gracie had
```

1    gotten sexually more aggressive?

2    A    (No response.)

3    Q    We've gone through a lot of chats.  Would it help you if I

4    were able to show you one of the chats?

5    A    I would agree with you, yeah.

6    Q    Okay.  All right.  And, again, that was all part of the

7    story line that you created?

8    A    Right.

9    Q    All right.  Now, in this story line of this very sexually

10   progressive family willing to sell their daughter who is also

11   sexually experienced, that was all packaged to Mr. Hosler.

12   A    Not specific to Mr. Hosler, but this was the background

13   story that I was using.

14   Q    But this was the only one that was communicated to Mr.

15   Hosler.

16   A    At this time, yes.

17   Q    But you don't know of a second story that was communicated

18   to Mr. Hosler.

19   A    Right, correct.

20   Q    So this would be the story that's communicated to Mr.

21   Hosler.

22   A    Correct.

23   Q    All right.  And early on, Mr. Hosler expressed some concern

24   that maybe you were law enforcement.

25   A    Correct.

```
1    Q    All right?  And you couldn't be honest.

2    A    Correct.

3    Q    That would probably have scotched the entire investigation.

4    A    It would have, yes.

5    Q    All right.  So you sent him a picture, correct?

6    A    Correct.

7    Q    All right.  And when he expressed those reservations, you

8    said, "Hey, law enforcement wouldn't send you a picture."

9    A    Uh-huh, correct.

10   Q    And you were playing a role with him, correct?

11   A    Yes.

12   Q    All right.  And part of playing that role was also throwing

13   him off the scent, that maybe he was law enforcement.

14   A    Right.

15   Q    All right?  He could have also been catfishing you.

16   A    Correct.

17   Q    Just for the judge's benefit, what is catfishing?

18   A    Catfishing is when you're portraying yourself online as

19   someone that you're not.

20   Q    And you didn't know if he was real.

21   A    Right.

22   Q    And he didn't know if you were real.

23   A    Correct.

24   Q    And you've testified about different steps that Mr. Hosler

25   took to verify whether you were real.
```

1    A    Right.

2    Q    He asked to have you send a video?

3    A    Yep.

4    Q    And he asked to have Facetime?

5    A    Right.

6    Q    Because those would be steps that would show you're not law

7    enforcement.

8    A    Correct.

9    Q    All right.  And each time you declined.

10   A    Right.

11   Q    You said you valued your anonymity?

12   A    Yes.

13   Q    All right.  And you didn't want to compromise your

14   daughter's privacy.

15   A    Yes.

16   Q    All right.  And you didn't trust him.

17   A    Correct.

18   Q    All right.  And at no time did you volunteer to show

19   Gracie's face.

20   A    Correct.

21   Q    All right.  And at no time did Mr. Hosler make a video of

22   himself.

23   A    Correct.

24   Q    At no time did he take a picture of himself and send it to

25   you.

```
1    A    No, he didn't.

2    Q    At no time did he ask that anything, whether a picture or

3    video, be shown to Gracie of him.

4    A    Correct.

5    Q    All right.  But there were conversations, and you've

6    testified earlier about that, where he'd asked if you'd told

7    Gracie.

8    A    Right.

9    Q    And you said -- initially you said you hadn't.

10   A    Initially, yes.

11   Q    In fact, throughout this entire investigation, he was

12   corresponding exclusively to you.

13   A    He would -- he would ask that I deliver messages to Gracie.

14   Q    Right.  But was there anybody else that was -- was Gracie

15   ever on the other end of the keyboard?

16   A    No.

17   Q    And part of this is you needed to keep the conversation

18   going.

19   A    Yes.

20   Q    Well, you didn't want him to lose interest.

21   A    Correct.

22   Q    All right.  You wanted him to follow through.

23   A    Right.

24   Q    You needed him to follow through.

25   A    I wouldn't say I needed him to follow through.  It was his
```

1    decision.

2    Q    Sure.  But we wouldn't be here today and you wouldn't be

3    able to make an arrest if he didn't follow through.

4    A    Correct.

5    Q    And part of the reason you go to all those trainings is to

6    make an arrest.

7    A    Right, and we do it legally too as well.

8    Q    Correct.  You have to make sure it's legal.

9    A    Right.

10   Q    Have to make sure he violates the law.

11   A    Correct.

12   Q    And part of this story line and what you were communicating

13   to Mr. Hosler was, well, this mom is a complete reprobate.

14   A    Uh-huh.

15   Q    We agree on that point?

16   A    Yes.

17   Q    All right.  She also had concern for her kid.

18   A    Right.

19   Q    All right.  Mr. Hosler couldn't be obese.

20   A    Correct.

21   Q    He said he could lose a few pounds, but he wasn't obese.

22   A    Correct.

23   Q    All right.  And she had to make sure that he didn't have

24   STDs.

25   A    Correct.

1    Q    All right.  And so he sent you STDs.

2    A    Correct.

3    Q    Sorry.  STD results.

4    A    Yeah.

5    Q    All right.  But he also asked -- or expressed interest in

6    being part of the family; isn't that correct?

7    A    Yes, he did.

8    Q    All right.  He wanted to be part of the family, correct?

9    A    Yes.

10   Q    And he wanted to have a long-term relationship?

11   A    He did.

12   Q    To be part of this sexual, incestual family?

13   A    Correct.

14   Q    All right.  And he didn't know what you had conveyed to

15   Gracie, correct?

16   A    Correct.

17   Q    All right?  Now, eventually you told him that you had told

18   Gracie that he was interested in meeting her, correct?

19   A    Yes.

20   Q    And that she was very excited.

21   A    Yes.

22   Q    All right.  And he asked you what clothes she might like,

23   correct?

24   A    Yes.

25   Q    All right.  He didn't ask that that be conveyed to Gracie,

1    correct?

2    A    (No response.)

3    Q    Would it help you to look at D-46?

4    A    Yeah.  I just want to double-check here.  You said D-46?

5    Q    Correct.

6    A    And can you just answer the question one more time?

7    Q    You mean ask?

8    A    Yeah, just ask the question again.

9    Q    The question was addressed to you, correct?

10   A    Yes, it was.

11   Q    It wasn't, "Hey, ask Gracie what she might like."

12   A    Right.

13   Q    And your response was, hey, whatever is most attractive to

14   Mr. Hosler.

15   A    Right.

16   Q    All right.  But a couple days later, you do tell him how

17   excited Gracie is to meet him, correct?

18   A    Yes, I do.

19   Q    All right.  And at that point, he asks you to convey a

20   message to her.

21   A    Yes.

22   Q    All right.  That message was, "Well, tell her the feeling

23   is mutual."

24   A    Correct.

25   Q    All right?  And then on a separate incident he says, "Give

1    her a hug for me."

2    A    Correct.

3    Q    All right.  Those were the two messages that he asked that

4    you convey to her.

5    A    Yes.

6    Q    Okay.  All right?  But he also said -- I just want to

7    follow up on a few points from your direct -- that he wanted to

8    be in a relationship with Gracie, that it didn't want to be

9    forced, correct?

10    A    Yes.

11    Q    All right.  And that was really building on this, I guess,

12    for lack of a better term, this incestual family.

13    A    Yeah.  Correct.

14    Q    He also even propositioned the mom.

15    A    Yes, he did.

16    Q    All right.  He wanted to actually see if the mom was

17    interested in a threesome.

18    A    Correct.

19    Q    All right.  And this whole time the mom was in control -- I

20    guess you were in control -- of the communications, correct?

21    A    Yes.

22         MR. BUGNI:  All right.  I'm reading the notes that are

23    being passed to me, Your Honor.

24         THE COURT:  You asked for it.

25         MR. BUGNI:  I have no further questions, Your Honor.

WADE BEARDSLEY - CROSS

```
1              THE COURT:  Okay.  Redirect?

2              MS. ALTMAN:  Just very briefly.

3                    REDIRECT EXAMINATION

4    BY MS. ALTMAN:

5    Q    You gave Mr. Hosler numerous opportunities to stop

6    communicating with you, correct?

7    A    Yes, I did.

8    Q    There were times you said, "If you're not interested, let's

9    just end this," correct?

10   A    Yes.

11   Q    "Lose my picture, lose my number" --

12             MR. BUGNI:  Objection.  Form, Your Honor.  Leading.

13             THE COURT:  It is leading.

14   BY MS. ALTMAN:

15   Q    Well, what were some of the opportunities you gave him to

16   back out of this relationship?

17             MR. BUGNI:  Objection.  Relevance.

18             THE COURT:  I think I take the point here, and I

19   don't -- we're not pressing any entrapment defense, so I don't

20   think -- I think it's established that that's part of the care

21   that he took in doing the investigation was to avoid entrapment,

22   and I don't see the defense is pressing the issue so -- you

23   don't have to persuade me that it wasn't entrapment.

24   BY MS. ALTMAN:

25   Q    And then I may have either misheard the question -- it's
```

1    true that, if you look at page E-006, he did ask whether he

2    could chat or communicate with Gracie, correct?

3    A    I just want to verify.  Yes.  He says, "Is there any way I

4    could chat/email with her."

5              MS. ALTMAN:  All right.  I have nothing further.

6              THE COURT:  Well, and also just to clean up because I

7    think Mr. Bugni wanted to make the point that the actual

8    communications that were asked to be conveyed to Gracie were

9    limited to those two.  There was the request on the chat, and

10   then, according to my notes, on page E-9 there is -- let's see.

11             MR. BUGNI:  "Let me know when you tell her"?

12             MS. ALTMAN:  "Let me know when you tell her and her

13   reaction."

14             THE COURT:  "And her reaction."  And so implicitly he's

15   expressing his interest in having his excitement and his

16   interest communicated to Gracie on that one too.

17             MS. ALTMAN:  Well, I'll follow up this way --

18             THE COURT:  Yeah.  We can argue about it later.  We're

19   going to have to do that, but I want to know -- and I have what

20   the exhibits are, but I just -- it would be good to have an

21   inventory of what we're talking about.

22   BY MS. ALTMAN:

23   Q    Detective Beardsley, Mr. Bugni said, "Is it true that there

24   are only two communications," correct?

25   A    Yes, he did.

—————WADE BEARDSLEY - REDIRECT—————

1    Q    Did you count them?

2    A    I didn't count them.

3    Q    Is it possible, when we go through these, that there are

4    more than that?

5    A    Yeah.

6         MR. BUGNI:  Objection, Your Honor.  If I can have --

7    actually the objection is both to the form, because, Mr. Bugni,

8    what is the question, and, two, let's define exactly what we're

9    describing.  If it's implicit communication, well, that's a

10   specific question that needs to be asked, and then we can go

11   through and answer it.  The exhibits are all in here, but my

12   question was very specific.

13        THE COURT:  I agree, and so, Ms. Altman, we've got the

14   texts, and we can argue about them --

15        MS. ALTMAN:  Yes.

16        THE COURT:  -- and I tried to keep note and be aware of

17   when there were -- when we had communications that would fit the

18   intermediary theory that the Court endorsed in *McMillan*, and so

19   if you just want to point those out to me later, we can do that,

20   but as long as we have the detective on the stand, if he's got

21   anything to add to our understanding of these texts, now is the

22   time to do that.  If we're just doing an inventory, I don't want

23   to have to go through and count all again myself.  I'm counting

24   on you to do that for me.  But if we're just doing an inventory

25   of what was said, we don't need to take the detective's time for

WADE BEARDSLEY - REDIRECT

1    that.

2              MS. ALTMAN:  I don't see it as being more than an

3    inventory, Your Honor.  I think the messages are what they are.

4              THE COURT:  Okay.  Then I think we've established what

5    we need to with the detective's testimony.

6              MR. BUGNI:  No recross.

7              THE COURT:  Okay.  All right.  Very good.  Let me just

8    take a minute and see if there's anything that I think I need to

9    know about.

10        I think I'm good.  Thank you, Detective.

11             THE WITNESS:  Thank you.

12        (Witness excused at 11:33 a.m.)

13             THE COURT:  Okay.  All right.  Ms. Altman, do you have

14   another witness or is that it?

15             MS. ALTMAN:  That's it.

16             THE COURT:  All right.  Okay.  Mr. Bugni, what do you

17   have for me?

18             MR. BUGNI:  We have -- we move under Rule 29 for a

19   judgment of acquittal.  No reasonable jury could find that,

20   under the intermediary theory, that Mr. Hosler tried to

21   communicate with the minor to persuade her to engage in sexually

22   explicit conduct or engage in the conduct that would be

23   outlawed, and there's two points to that.

24        First, and I'll argue this in closing as well, but Agent

25   Beardsley --

```
 1              THE COURT:  Well, let's not do it twice.  If you're
 2     going to argue it in closing --
 3              MR. BUGNI:  Well, it's two different standards.  I know
 4     you can parse it, so I'll stand --
 5              THE COURT:  Yeah.  Let's make a record here --
 6              MR. BUGNI:  That's fine.
 7              THE COURT:  -- that you're making a Rule 29 --
 8              MR. BUGNI:  As to Count 1.
 9              THE COURT:  -- motion for judgment of acquittal as to
10     Count 1, and then you can flesh it out more greatly, and then
11     I'll have a different perspective on the evidence at different
12     times, but just give me the substance once later when we do your
13     comprehensive presentation to me, but your motion is noted, and
14     I have -- you've articulated the basis for it.  Then you're
15     going to give me your arguments in support of that basis later.
16              MR. BUGNI:  I'll do that.
17              THE COURT:  Okay.  All right.  Do you have any evidence
18     to present?
19              MR. BUGNI:  No, Your Honor.
20              THE COURT:  Okay.  All right.  So where do we go?  Now
21     it's time for your rebuttal where you're going to put the videos
22     in.  Here's the thing:  We have the advantage here of -- what's
23     that?
24              MR. BUGNI:  What rebuttal?
25              THE COURT:  Well --
```

1            MR. BUGNI:  I didn't put any evidence in.

2            THE COURT:  So now let's revisit the issue.  Here's the

3    thing:  I don't think there's any doubt about Mr. Hosler's

4    intention of what he was going to do with Gracie when he got to

5    Eau Claire, and so I don't need to see any evidence on that

6    point.  I think the evidence is exquisitely clear on there, and

7    I can tell you it's not like we had a jury trial and there might

8    be some lingering doubt about whether they'd be persuaded.  I'm

9    the trier of fact, and I can tell you I'm completely persuaded

10   of that.  So if you want to make a proffer about what those

11   videos would be, that might be the appropriate way to preserve

12   the government's rights on the record, if you want to do that.

13           MR. BUGNI:  Do you want me to help you protect your

14   record real quick?  You need to ask Mr. Hosler if he wants to

15   testify.

16           THE COURT:  Very good.  Thank you.

17       Mr. Hosler, you have the right to testify in the case, and

18   have you discussed with your attorney about the benefits and

19   risks of testifying in your own defense?

20           THE DEFENDANT:  Yes, I have, Your Honor.

21           THE COURT:  Okay.  And if you testify, you'll be

22   exposed to cross-examination by the government, of course.

23   You're aware of that?

24           THE DEFENDANT:  Yes, sir.

25           THE COURT:  Okay.  And have you made a decision about

1    whether you want to testify?

2              THE DEFENDANT:  Yes, I have.

3              THE COURT:  And what is that decision?

4              THE DEFENDANT:  I choose not to testify.

5              THE COURT:  Okay.  Very good.

6    Thank you, Mr. Bugni.

7    Okay.  So you want to make a proffer on what the videos

8    would show?  Just so we have a record, in case it comes up, then

9    at least people would know what the videos are -- what the

10   videos involve.

11             MS. ALTMAN:  Yes, Your Honor.  The videos all involved

12   girls approximately between ages -- prepubescent, 10 to 12ish.

13   There were -- one showed a prepubescent girl topless wearing a

14   skirt and no underwear.  She's exposing her vagina, rubbing her

15   fingers around her vaginal area.  One shows a prepubescent girl,

16   a different one, removing her jeans and her shirt.  She rubs her

17   vagina as the camera focuses in on it.  And there is another

18   video that shows a prepubescent girl sucking on an adult male's

19   penis.  That's the nature of them.  There were two others, but

20   they were of similar ilk.

21             THE COURT:  All right.  The difference between evidence

22   of motive and intent and propensity evidence is sometimes razor

23   thin.  I'm inclined to believe, based on our earlier discussion,

24   that this is one of those that could go to motive or intent, but

25   even if I conclude that, then I still have to do the 403

balancing here, and because I'm already persuaded of Mr.
Hosler's intent, I think it would be -- if there were a trier of
fact that had to consider it, I would be inclined to say it's
needlessly cumulative, and the fact is it does carry -- this
doesn't make it inadmissible -- but it does carry a propensity
aspect to it, which wouldn't make it inadmissible if it had a
propensity-free justification as well, but the corollary
propensity dimension is always present, and it's present here.
So this is one where I would say that the danger of unfair
prejudice would vastly outweigh its need for the purposes of
this case because there's such ample evidence of his intent
anyway, so that would be my -- that's my ruling on that.  I
think you've made an adequate record.  If the Court of Appeals
wants to take up the issue, they can.

     Okay.  What's left now?  The closing arguments?

          MR. BUGNI:  Closing arguments.

          THE COURT:  Okay.  All right.  Ms. Altman, do you want
to go first?  You can be succinct.

          MS. ALTMAN:  It's Ms. Schlipper.

          THE COURT:  Very good.  All right.

          MS. SCHLIPPER:  All right.  I first have a PowerPoint,
but it is literally about 11 minutes.

          THE COURT:  That's fine.  I'm happy to have the
guidance.

          MR. BUGNI:  Your Honor, I hurt my hip.  Is it okay if I

1    stand for a second?

2                 THE COURT:  It's okay.

3                 MR. BUGNI:  I'm getting old.

4                 THE COURT:  In the courtroom you hurt your hip?

5                 MR. BUGNI:  No.  I've got five kids, so I don't know

6    what happened, but it's been bothering me.

7                 THE COURT:  All right.

8                 MS. SCHLIPPER:  All right.  The defendant, Robert

9    Hosler, used promises of money, travel, the idea of a better

10   life, the idea of giving the mom a break or even a vacation to

11   induce this fictitious mom, Amanda, to allow him access to

12   engage her daughter in sexual activity.  The defendant used his

13   powers of persuasion when suggesting that he was going to treat

14   the victim like a queen, he was going to help her with her

15   homework, expose her to the world, and generally going to help

16   them.

17        What he was really trying to do was to persuade this

18   fictitious mother to give up her daughter to him and then so he

19   could entice Gracie to pick him, Robert Hosler.  He attempted to

20   induce Amanda to allow him to sexually assault Gracie, to allow

21   him to rent Gracie out for the weekend, giving Amanda the idea

22   that they could escape from their world of cleaning houses and

23   living paycheck to paycheck.  He even brought the idea of

24   bringing them together for Thanksgiving dinner.  There were

25   great things to come.  He was then going to use presents, he was

1    going to use booze, and the promise of love to get in Gracie's

2    good graces so that she would engage in sexual activity with

3    him.

4         Count 1 alleges the child enticement.  I'm very briefly

5    going to go through the elements and how the government has

6    satisfied them.  First, it's undisputed that the defendant

7    communicated with Detective Beardsley over the internet and

8    through text messages, so it satisfies interstate commerce.

9         How do we know that he attempted to persuade, induce, or

10   entice the minor?  Dictionary.com tells us that the definition

11   of "induce" is to bring about, to produce, or to cause.  But for

12   the defendant, this case would never have happened.  He was

13   browsing on this site, he admitted that he knew what it was for,

14   and he saw that it was for people offering underage sex.  He

15   responded to the ad.  He spent weeks chatting with Detective

16   Beardsley in an attempt to negotiate the deal.  He persuaded the

17   fictitious mother to choose him.  He wanted to persuade Gracie

18   to trust him.  Every email, every text was part of the

19   negotiation.  He wanted contact with Gracie and relayed messages

20   through Amanda, and he took the necessary steps to make it

21   happen.  It makes no difference that the defendant was

22   communicating with the mom.  He was attempting to induce her to

23   allow him to get access so he could then persuade Gracie that he

24   was a good guy so he could sexually assault her.

25        How do we know that he believed the minor was under age 18?

1    We know that because Detective Beardsley -- I think there's

2    actually four examples, but he said, "She's going to be 13 next

3    month.  It's easy with her being 12."

4        How do we know that he was attempting to persuade or induce

5    the minor to engage in sexual activity?  He was really explicit

6    in his communications.  To look at the defendant's own words, "I

7    saw your post.  I'm interested in the goods.  Any chance I can

8    see the goods?"

9        Detective Beardsley said, "She started with licking and

10   building up from there."

11       He clarified, "So nothing is off limits?"

12       Detective Beardsley asked him his penis size and said that

13   "A condom would be required unless you can prove you're clean."

14       The defendant said, "I know how to go slow and ease into

15   it," while giving his penis size.  He said, "I would say I'm

16   more of a giver than a receiver."  He said he wants to -- wants

17   her to be on top.  He wants to do her from behind, and he wanted

18   to do oral, vag, and anal.  Of course he's talking about sex.

19       He clarified, "She likes licking.  Is there anything else

20   she likes to do or favorite positions?"

21       He loves "doggy style."

22       Has she started her period yet?

23       Detective Beardsley says, "No.  It makes things a whole lot

24   more simple."

25       The defendant says, "Okay.  That it does."

1    He asks about her "libido," which we know is sex drive.

2    "Does she engage?  Does she initiate?"

3    He talks about his test results coming back and "it all

4    looks like I'm clean."  The mom then says, "I know you're clean,

5    but she hasn't had her period, so I would prefer you pull out."

6    The defendant responds, "Is that a hard request?  Because in

7    the heat of the moment -- but if that's what you want, I can do

8    it.  Either way we could get cleaned up right away."

9    This is all talking about his attempting to persuade to

10   engage in sexual activity.  In Wisconsin it is a crime under

11   Section 948.02(e) to have sex -- to have sexual contact or

12   sexual intercourse with a person who has not attained the age of

13   13.  He's clearly saying he wants vaginal, oral, and anal sex.

14   How else do we know that he's talking about sex?  He sent

15   this STD results, Exhibits L and M, to suggest that he wants to

16   have even unprotected sex with this minor.

17   How else do we know that he attempted to commit the crime of

18   enticing a minor to engage in the sexual activity?  His actions.

19   The defendant took significant, substantial steps.  First, he

20   booked a flight and traveled on this flight.  He got on that

21   airplane from Texas to Minnesota.  He rented a car.  He got to

22   Minnesota.  He rented a car, and he drove several -- or an hour

23   and a half from Minnesota to Wisconsin.  The entire time --

24   well, not the entire time.  Several times throughout the course

25   of that time, he's communicating with the mom.  "I've landed.

1    My plane's late.  I'm on my way."  And he put the GPS, and he

2    actually drove, to McDonough Park Playground, which he put in

3    his GPS.  Again, giving updates, "I'm at the playground.  Where

4    are you?"  The fact that he showed up is a substantial step.

5    The government has met its burden as to Count 1.

6         Count 2 charges the defendant with traveling to engage in

7    illicit sexual contact.  Again, briefly how the evidence

8    satisfies those elements, the defendant traveled in interstate

9    commerce.  It's undisputed he purchased a ticket and flew, got

10   on that plane from Texas to Minnesota to meet with Gracie, and

11   then he rented a car and drove from Minnesota to Eau Claire,

12   Wisconsin.  We already looked at those exhibits, so I won't go

13   through them again.  He drove over 90 miles per hour and ended

14   up that he was arrested in Eau Claire, Wisconsin, starting out

15   in Texas.

16        How do we know that his purpose for traveling in interstate

17   commerce was to engage in illicit sexual contact?  Again, I

18   won't go through the slides, but it's all the same evidence, the

19   defendant's words.  He talked about wanting anal, vaginal, oral

20   sex.  What makes it illicit sexual activity?  There are three

21   ways to satisfy this, and the government has satisfied all

22   three.  Briefly, had the sex been -- I'm paraphrasing -- had the

23   sex been with someone who has attained the age of 12 but not 16

24   and is at least four years younger than the defendant, it's an

25   illicit sex act.  Here we know that the defendant was 27, Gracie

1  was put forth as being 12, and the sex acts, again, he wanted

2  oral, anal, vaginal.

3      Next, it is illicit if the defendant traveled to engage in a

4  commercial sex act with the minor.  Again, we have to look at

5  the defendant's words and actions.

6      Defendant:  "How much will the goods be and how long?"

7      The mom:  "For an hour, I could do $200."

8      "Okay.  So what about a weekend?  Can I do a weekend?"

9      She talks about a weekend and wants to know how many times.

10      He wants to know how much would it be to engage in sex for a

11  weekend.

12      She says, "How many times?"

13      He responds, "Three to five."

14      He asks this mother in Eau Claire if she will accept cash or

15  cryptocurrency to pay for sex for the weekend.

16      And then a few days or the day before -- a few days before

17  he flies in, the mom asks, "And how much would you be giving me

18  then?"

19      And the defendant responds, "I'll have at least five to

20  six."

21      And then what does he do?  He's arrested with 520-some

22  dollars on his person, which was the negotiated price to pay for

23  sex with the daughter.

24      Finally, it is also the third way to do this, it's an

25  illicit sexual activity if the defendant traveled to engage in

1   the production of child pornography with a minor.  Not

2   surprising, we're going to look at the defendant's words and

3   actions.

4        He asks, "What about photos or recordings?"

5        The mom says, "As long as you promise they never get

6   released online."

7        He says, "They won't even be hooked up to a computer with

8   online access."

9        And the mom says, "Well, are you going to take videos or

10  just a few photos?"

11       Defendant says, "I can do either.  I have editing software

12  that will blur out anything you want, and all this will be done

13  off network on a secured device."

14       "When you come, can you show me the software?"

15       "I was going to do it when I got back.  I don't want to

16  travel with all that on me."  He's going to blur out the images

17  or the faces, and he doesn't want to travel, suggesting that

18  it's going to be child pornography.

19       When she asks "Just modeling pics and videos or more," the

20  defendant says, "Well, let's start there and see where it goes."

21       We also know that in his interview when Detective Beardsley

22  asks if he was planning to record the sexual assault with

23  Gracie, if that's one of the purposes of the GoPro, the

24  defendant says yes.

25       The mom is saying she would be -- she would get in a lot of

1    trouble if these videos or pictures of her daughter got out.

2    And the defendant confirms, "You and me both, but I have

3    safeguards in place that will permanently purge everything."

4    He's talking about the child pornography.  How do we also know

5    that?  He brought all of the equipment.  He brought a

6    head-mounted scene lighting, two different GoPros, a handheld

7    video camera.

8        So the government has also satisfied its burden in proving

9    the elements of Count 2, and so we would ask that you find the

10   defendant guilty as to both counts.  Thank you.

11       THE COURT:  All right.  Very good.  I may have some

12   questions for you after Mr. Bugni goes.

13       All right.  Mr. Bugni.

14       MR. BUGNI:  I mean, I've --

15       THE COURT:  I see -- here's the things that strike me

16   as not disputed from your -- if any of these are actually

17   disputed, then you correct me, but the intent to engage in

18   sexual activity --

19       MR. BUGNI:  You got it.

20       THE COURT:  -- not disputed.  The interstate travel,

21   not disputed.

22       MR. BUGNI:  Count 2 is done.

23       THE COURT:  Yeah.  And because the intent was to engage

24   with sex with somebody between the ages of 12 to 16 that was

25   four years younger than he was --

1            MR. BUGNI:  We concede it.

2            THE COURT:  -- it was a commercial sex act.

3            MR. BUGNI:  We concede it.

4            THE COURT:  And it was also --

5            MR. BUGNI:  Sorry.  As to Count 1 or Count 2?

6            THE COURT:  We're talking about Count 2.

7            MR. BUGNI:  Yeah, I concede all of Count 2.

8            THE COURT:  Okay.  All right.  So it would also be to

9    engage in child pornography.  Okay.  So --

10            MR. BUGNI:  Well, I don't concede that.

11            THE COURT:  That one you don't concede.

12            MR. BUGNI:  But, I mean --

13            THE COURT:  I've got two other bases for the illicit

14   sexual activity.  You don't concede that one.  But, honestly, I

15   would be able to find that one.

16            MR. BUGNI:  Yeah.

17            THE COURT:  Even the third on the child pornography.

18   Now, so the real issue is whether -- and there's clearly

19   communications adult-to-adult.  The objective of that

20   communication was to arrange and consummate sexual activity with

21   the fictitious 12-year-old.

22            MR. BUGNI:  Correct.

23            THE COURT:  And there's no dispute about the age.  Even

24   though the ad said 13, it's also established that she's 12, and

25   you're not disputing that either.

1          MR. BUGNI:  Right.

2          THE COURT:  So the only question is whether the

3    communications, whose clear objective was to get Gracie to

4    engage in sexual activity with the defendant, count as

5    enticement or, more precisely, attempted enticement under the

6    statute.

7          MR. BUGNI:  That's right.

8          THE COURT:  Okay.  And so let's just drill down to it.

9    So it doesn't -- I'm not aware of any requirement that it has to

10   be a really sustained effort, but there are at least two times

11   when the defendant asked Amanda to communicate to Gracie that he

12   shared her excitement about meeting and that he wanted her to

13   give a big -- to give her a big hug.  And so why aren't those

14   communications part of his overall plan to entice Gracie to have

15   sex with him?

16         MR. BUGNI:  They are part of the overall plan, but

17   that's not what gets you a conviction on Count 1.  So it has to

18   be that those -- I am actually communicating through the adult

19   to the minor, and here all we have is Beardsley controls

20   everything, all right?  He controls it on two fronts.  One, the

21   story line.

22         THE COURT:  Absolutely.

23         MR. BUGNI:  All right?  And that story line is

24   something -- when you think about persuasion, inducement, it's

25   something to overcome another person's will, all right?  If the

1    will has already been set, as disgusting, as repugnant as this

2    is that a 12-year-old is actively engaging in sexual conduct and

3    you've set the table, and that's what he's done, there's no

4    inducement.  There's no enticement.  There's no changing of this

5    child's will that is already preconformed.  That's the fiction

6    that he embraced.  He could have chosen a virgin.  He could have

7    chosen somebody who was reluctant.  He could have chosen a

8    thousand different story lines, but he created this one, and

9    this one is the one you have to judge.

10         THE COURT:  So in this story, this Gracie was really

11   impervious to inducement because she was a willing participant.

12         MR. BUGNI:  That's right.  As disgusting, as abhorrent

13   as that is, this is the story line they created.  It's an

14   incestual story line, a story line with, you know, sex with the

15   mother, biological father, uncle, and boyfriend.  You know,

16   Gracie is the one who is like "I've got to move on.  You know,

17   mom and boyfriend just aren't enough."  So there is no

18   inducement within that scenario.

19         THE COURT:  But the problem with that is that Gracie

20   was not willing to have sex with just anyone.  You had to

21   persuade her that this was a person that you would let into this

22   sexually progressive family and that she would be willing to

23   have sex with that person.  Granted, she had been groomed, but I

24   don't think that the fact that -- and, again, we're all talking

25   about this fictitious person, but the fact that the child had

1    been sexualized and was, as a matter of fact, a willing

2    participant, that doesn't mean that inducement is impossible.

3            MR. BUGNI:  Well --

4            THE COURT:  You still have to persuade your sexual

5    partner to engage with you.

6            MR. BUGNI:  Correct.  But you have, like, the false

7    premise that Gracie still had to be convinced, that there was

8    actually some evidence of that, and there was none.  It was

9    actually that Gracie is looking for this.  So, you're right,

10   there has to be consent.  Consent is always an aspect of it

11   otherwise it's rape, but within this scenario that they put,

12   there's no overcoming of her will.  Like, her will has not

13   been -- like, "I've got to change it.  I somehow have to get

14   this girl to agree to sleep with me."

15           THE COURT:  That's shot through this whole thing.  He's

16   got statements where he says, "We've got three days to fall for

17   each other," so it's clear that there still has to be an element

18   of persuasion or enticement, and I think the statute is drawn to

19   cover the full range of inducements from virgin on the one end

20   to enticement on the other, which is -- you know, one you use

21   some means of compulsion to overcome the person's will by force

22   or some fraudulent thing.  On the other end of the spectrum, and

23   I think the statute is designed to cover them all, you just make

24   it seem appealing to the person.

25           MR. BUGNI:  Sorry.  I think two parts.  One, the talk

1    about the three days is really to, like, this whole, like, "I

2    want to join the incestual family."  It's not like, you know,

3    "That's what's going to allow me to finally have sex with her."

4    You know, it's already assumed you're going to have sex with

5    her, so, like, your "Hey, Bugni, this rebuts you" is going right

6    to whether or not he's going to be able to continue having sex

7    with her, whether or not this is going to become like, you know,

8    the threesome dream that somehow he's dreamed up.  So I don't

9    think that defeats --

10           THE COURT:  I'm not sure you're getting the point,

11   which is that the theme of much of the communications are what

12   are the things that the defendant is going to have to do to make

13   himself appealing to Gracie.

14           MR. BUGNI:  I don't -- go ahead.

15           THE COURT:  And so we have to make sure he's not obese.

16   That would not be good.  So Gracie -- that was Gracie's issue,

17   so Gracie wouldn't do -- wouldn't have sex with him if he's

18   obese, and then there are lots of discussions about the things

19   that Mr. Hosler would give her, do her, and treat her to make

20   him an appealing partner for Gracie.

21           MR. BUGNI:  So in what form of -- like, the form of,

22   like, the sexual activity?  Like she wants to be licked and

23   played with --

24           THE COURT:  For example, she likes princess things.  If

25   you bring her princess things, princess gifts, she will love

1    you.  And so it's also clear that they have to test it out and

2    see if Gracie is going to like him.

3            MR. BUGNI:  So, as to the first, and that's maybe where

4    we're talking past each other, and I don't mean to disrespect

5    the questions, it's that in the first I think you're conflating

6    Gracie and Amanda.

7            THE COURT:  Well --

8            MR. BUGNI:  That's all coming from Amanda.

9            THE COURT:  They are blended here.  If we break it down

10   into the three sort of third-party theories that we have in

11   *McMillan* --

12           MR. BUGNI:  Yes.

13           THE COURT:  -- one is clearly satisfied.

14           MR. BUGNI:  Yes.

15           THE COURT:  Number one.

16           MR. BUGNI:  Done.

17           THE COURT:  That Mr. Hosler is attempting to prevail on

18   Amanda to allow him to have sex with Gracie.  Regardless of what

19   Gracie wants, he's got to get Amanda's consent before he can

20   have sex with Gracie, so he's clearly doing that.  No question.

21           MR. BUGNI:  Yes.

22           THE COURT:  We're in agreement on that.

23           MR. BUGNI:  Well, I'm not going to concede my client's

24   guilt, but, like, I agree with you the facts would allow for

25   that but -- go ahead.

1          THE COURT:  Yes.  Okay.  Then the second one is when

2     you rely on the influence of the third party over the minor.

3          MR. BUGNI:  I agree with you.

4          THE COURT:  And he's clearly doing that too.

5          MR. BUGNI:  That's right.

6          THE COURT:  He's kind of making himself seem appealing

7     that she can then influence Gracie into thinking this is a nice

8     thing and a good thing, so he's clearly doing that.

9          Then we've got the third one, which is the third party is

10    used as an intermediary to communicate with Gracie, and so your

11    position is Gracie was already super willing and was so willing,

12    in fact, that she did not have any will to be overcome, and I'm

13    saying that when I look at what I see here is that Gracie,

14    fictitious though she be and in a very peculiar kind of family

15    environment in which she is highly sexualized to the point of

16    becoming sexually aggressive as a 12-year-old, that she simply

17    has no will to be overcome, the most -- person with the most

18    rapacious sexual interests still gets to choose who they have

19    sex with, and you have to persuade that person to engage with

20    you, and that is what this communication is about.  So I

21    disagree with your premise that she's impervious to enticement

22    because she was universally willing.

23         MR. BUGNI:  So then the statute is criminalizing all

24    sexual discussion.  It doesn't need to be coerced, enticed,

25    persuaded.

1          THE COURT:  It's got to be one of those.

2          MR. BUGNI:  No, it doesn't.  If it's going to be that

3    reading of the statute, then it should just take out those verbs

4    because that has to be part of every sexual act.  You'd agree

5    with that.  Like, all sexual acts still have to say, you know,

6    "I consent.  I agree.  I want to have sex with you."  Therefore,

7    putting those verbs in there means that it's something beyond my

8    willingness or, like, that sexual act -- you guys, I got -- I

9    can't hear with the background.

10          THE COURT:  I'll give you a chance to respond.

11          MR. BUGNI:  I didn't mean that to be rude.  If a jury

12    was here, I'd never do that, but I've just got to be able to

13    hear you.  And so -- I lost my train of thought.

14          THE COURT:  You'll get it back.

15          MR. BUGNI:  So the persuade, induce, all of those

16    things are extra steps beyond the will.  In your conception of

17    it, then don't have that.  Whoever uses a telephone

18    communication to have sex with a minor is guilty of, you know, a

19    Class A felony.

20          THE COURT:  But your argument is an absurd reduction.

21    So by your explanation, if I have a 3-year-old that just loves

22    to eat peanut butter off my penis, I can't induce him to do that

23    again because he just loves that.  There's no will to overcome.

24    And the idea that there are children who are impervious to

25    enticement because they are so willing to have sex just seems to

1    me to be an absurd reduction of the concept of child enticement.

2         MR. BUGNI:  What if it was an 18-year-old, a

3    20-year-old?

4         THE COURT:  Then it's not a child.

5         MR. BUGNI:  But, again, like -- okay.  Like you're

6    saying that, like, agency and the ability to have will -- I

7    agree with you, like, at 3 you don't even -- you don't have the

8    ability to reason, but, like, at some point --

9         THE COURT:  But you can still be enticed.

10        MR. BUGNI:  If I'm going through the channels of

11   interstate commerce to do that, to, like, somehow overcome that,

12   and I would agree with that if it was like *McMillan,* if he was

13   putting himself out there saying like, "Hey, you know, like, I'm

14   looking for this" or he was making those affirmative actions.

15   But here what you have is that Beardsley is the one who puts it

16   all out there.  That's the thing is the response.  You're

17   putting his offer and then his acceptance and trying to switch

18   the two, and it's not that way.  Because look at what they do in

19   *McMillan,* and that's, again, a Rule 29, so I'm going to also

20   appeal to you as, you know, James Peterson, but I'm appealing to

21   you right now as a justice -- as a judge, that there it's like,

22   "Hey, sell me your daughter.  Oh, your daughter has a little

23   hesitation?  Guess what?  You know, check out this dick pic.

24   She's really going to like that."  That's overcoming the will --

25        THE COURT:  I don't see that as any different here in

1    that there's a discussion about what Gracie is going to -- is

2    going to like and how this person is going to have to be made

3    attractive to Gracie.  And it's also this, that I think that --

4    and, again, I look at the *Hite* case, and so the intermediary

5    theory also, it seems to me, suggests that you don't need the

6    ultimate act of persuasion to be done through the intermediary.

7    So it's an attempt.  So ultimately Gracie is going to be the

8    final arbiter about whether she has sex with the defendant, and

9    so what happens is that he takes -- and this is why the attempt

10   is important.  Ms. Schlipper didn't address it, but the *Hite*

11   analysis suggests that you can use the person as the

12   intermediary to get the opportunity to have the decisive

13   enticement done in person.  And it seems to me we've got that

14   going on here too, which is that Mr. Hosler has to persuade

15   Amanda to allow him access to Gracie, and then he closes the

16   deal with the princess dress.  And so he is trying to entice her

17   into having sex, and he uses his communications with Amanda to

18   get into the position where he can make the final gift of the

19   princess dress and entice her that way.  That seems to be

20   approved under *Hite* as well.

21        MR. BUGNI:  And here's the problem with *Hite*, is what I

22   like from *Hite* is the overcoming of the will and the really good

23   definition --

24        THE COURT:  And I think that that's endorsed as the

25   core of the crime in *McMillan* as well.  That's the enticement.

1    MR. BUGNI:  Yeah.

2    THE COURT:  That's the defining aspect of enticement is

3    somehow you overcome the will --

4    MR. BUGNI:  And so --

5    THE COURT:  -- of the minor.

6    MR. BUGNI:  Yes, but here's the problem with *Hite,* is

7    that you can't divorce the actual crime that you're

8    criminalizing and the attempt from the channels of interstate

9    commerce.  Remember, Congress can only operate -- it doesn't --

10   you know, once you've sent an email, everything else after that

11   is now a crime.  Congress criminalizes the use of the channels

12   of interstate commerce, here the internet, to do this act, to

13   attempt to persuade this child, which it has to be that

14   persuasion that's communicated, that is, if you agree with the

15   third premise of *McMillan*.  If it's one or two, I'm done, and

16   you've got to do it, but if you're going to hold to three, which

17   I think is the only way to do it, then what was the

18   communication that was directed over the channels of interstate

19   commerce through Amanda to Gracie?  "Tell her I'm really excited

20   too."  That's not a persuasion.

21   THE COURT:  It's minor in the context of the whole

22   series of communications.  I will give you that.

23   MR. BUGNI:  Yeah.  But it has to be that communication,

24   that that's being sent across the state lines, that you're

25   criminalizing.  It's not everything else -- what if they were

1      to -- let's just say they were both in Wisconsin, all right?

2      Eau Claire and Stevens Point, all right?  They're just yelling

3      back and forth.  Here you go.  And Beardsley doesn't look like

4      Beardsley.  And then, like, "Hey, I'm just going to send" -- you

5      know, like, "Hey, I'm going to take off for a minute."

6           "Great.  I'll text you."

7           "Oh, Amanda said she likes me?  Well, tell her I'm excited

8      too."  Sorry, I meant Gracie.

9           That has to be the act that gets you the federal

10     jurisdiction that brings you here in federal court.  That's why

11     it's so important.  You can't divorce the actual crime --

12               THE COURT:  And I understand that theory too.

13               MR. BUGNI:  Okay.

14               THE COURT:  I'm not sure -- I don't see that as --

15     that's like the narrowest ground of the narrowest ground.

16               MR. BUGNI:  And that's the one you should accept.

17               THE COURT:  I understand your position.

18          Okay.  Ms. Schlipper?

19               MR. BUGNI:  Well, hold on.  Can I -- sorry.

20               THE COURT:  I don't mean to say that you're done.  I

21     think we understand each other.

22               MR. BUGNI:  I think -- I do, but this is the other part

23     of it, all right?  And I would be remiss.  Hosler deserves my

24     very best, and there's two aspects to this.  There's one, the

25     legal, the Rule 29.  I think I've given it to you.  It's

```
 1    really -- if they say McMillan is really the standard for a Rule
 2    29, any rational fact finder, I think we're short of McMillan.
 3    We really are.  There's no dick pic.  There's no -- like, it
 4    goes beyond it there.  So there as a judge I ask you.  But now
 5    as a fact finder that, like, the reason we went with a bench
 6    trial is I trust you more to make a difficult decision than I do
 7    12 people off the street and because it's a repugnant decision.
 8    Nobody is sitting here liking what Hosler did.  Nobody is like,
 9    "Oh, man, this guy really deserves a break."  But here it is
10    applying the law and looking at it, and if you're -- if you
11    apply the law of theories one and two, I think you've got to
12    find him guilty.  I'm not conceding it, but, like, I'd be
13    dishonest.  But if you truly apply McMillan three and say "Is
14    that beyond a reasonable doubt?  Am I convinced beyond a
15    reasonable doubt that that's what he did?"  Because any
16    rational --
17            THE COURT:  Well, let's be clear:  I don't really see
18    any brute factual ambiguity here.  I have the communications.
19            MR. BUGNI:  Yeah.
20            THE COURT:  The communications are what they are.  I
21    don't think -- with all due respect to the detective's
22    investigation of it, I don't need his help to interpret the
23    communications.
24            MR. BUGNI:  That's right.
25            THE COURT:  They are what they are, and I agree with
```

1    you that most of the communication here was -- well, all of it

2    directly was directed to Amanda, and a few of them are directed

3    to Gracie through Amanda.  The two clearly explicit ones are the

4    ones that we have discussed, the feeling is mutual, give her a

5    big hug, but there are others that are also directed toward

6    communicating information to Gracie about Mr. Hosler, still

7    relatively minor in the whole complex of the communications, but

8    there's about two more that indicate Mr. Hosler's interest in

9    having Amanda communicate to Gracie about him in a way that

10   would make him appealing.  So I don't see it as a factual

11   dispute.  It's do those facts -- and this is why I think my role

12   here as the judge is more important than my role as the fact

13   finder, because the question is do those facts constitute an

14   offense under the statute.

15              MR. BUGNI:  I think that's where you're wrong.

16              THE COURT:  Well, help me understand that because --

17              MR. BUGNI:  Because in one sense there's such different

18   standards of the Rule 29 and whether or not any rational juror

19   can find it.  There are brute facts, and you could extrapolate

20   from that, and then you could say, you know, "Yeah, there's

21   enough.  There's just enough," and that, for any rational juror,

22   is a very low bar.  I mean, I'm haunted by how low that bar is

23   in cases where the Court of Appeals is like, "Yeah, we think you

24   got a bum deal, but, you know, that's the verdict."

25         But here it's saying, like, are you convinced?  Are you

```
 1    actually convinced and you believe that, like, this is what
 2    happened here, that those two communications, or even those four
 3    if you want to expand it to, like, was she excited, whether or
 4    not those four are enough to violate the statute.  You say,
 5    like, I'm convinced beyond a reasonable doubt.  I'm willing to
 6    impose a ten-year mandatory minimum.  I'm willing to say that's
 7    what happened here, and I'm willing to find him guilty.  I have
 8    that same conviction.  I know we don't define reasonable doubt
 9    in the Seventh Circuit to a jury, but in the Eleventh Circuit,
10    that's where it was, and we used to say "Do you have the same
11    certainty that you would have with your own affairs that that's
12    what happened?"  And that's just not here.  There's four
13    communications.  You'd be like, "Well, those are data points,
14    and those are things that maybe I should have a follow-up on,
15    maybe I want more information or I'm uncomfortable with.  It
16    looks bad" --
17            THE COURT:  I'm still struggling a little bit with what
18    you think the factual -- because I think you're agreeing with me
19    that the brute facts are what they are.  We know what was said.
20            MR. BUGNI:  Yeah.
21            THE COURT:  So is it there's a dispute about the
22    inference that I should draw from that?
23            MR. BUGNI:  That's right, or whether or not they're
24    sufficient.  I guess that's the problem.  Is it sufficient as a
25    matter of law that any reasonable jury could find it.  I say no.
```

```
1    You can disagree, you know.  But whether or not as, like, a
2    rational human being who says like, hey, if we just called you
3    up -- you know, you were at Godfrey, you know, and I'm like,
4    hey, like a "P" lawyer, a Ph.D., that seems great.  We'll put
5    him on the jury.  You know, like, let's see what he thinks.
6    That's what you're called upon.  That's why we go bench.  We
7    don't -- I sometimes go bench to preserve the legal argument.
8    Here I've done a pretty good job at that, but we also go bench
9    because we say you can sort the bad facts, and you can say,
10   like, "I don't know if I really am convinced."  I remember
11   sitting back when I was clerking for 45 trials being like "I
12   would probably walk that person.  I would have found that dude
13   guilty," and there was that part of it, and I think too I would
14   want myself on a jury, you know.
15        And that's what we have here.  We want you to make that
16   decision.  We're asking you to make that decision as a human
17   being saying, like, "You know what?  I actually don't believe
18   that people should be sent away on those bare minimum facts.  I
19   think that you need to be beyond a reasonable doubt," and they
20   knocked it out of the park on beyond a reasonable doubt on Count
21   2.  They knocked it out -- you know, like the things that they
22   had were so far beyond a reasonable doubt.  That's great, and
23   that's why we conceded all of them, but here they don't have it
24   beyond a reasonable doubt.  They might have it any rational
25   juror could find it, but it's not where I'd be convinced, you
```

1    know, that I'd want to act with the same certainty in my own

2    affairs.  It's just not beyond a reasonable doubt.

3          THE COURT:  And the issue, and I really want to get the

4    issue here, which is that the communications directed to Gracie

5    with Amanda as the intermediary are not communications that

6    played a role in the inducement to have Gracie have sex with Mr.

7    Hosler.

8          MR. BUGNI:  Yes.  And that they're not -- those weren't

9    the attempt to induce here.  You know, like, remember, like --

10   and, again, like, we're going with the narrowest of narrow, and

11   I'm arguing that to you as the fact finder, but like, boom,

12   those communications, is that trying to -- you know, "Give her a

13   hug from me."  Is that trying to overcome her will?  No.  "Tell

14   her I'm excited too."  No, that's not overcoming her will, and

15   that's what I'm arguing to you.  That's what I would if you were

16   sitting right there.  I'd say, like, "That's just not enough.

17   That's not sufficient, and you can't be convinced of that beyond

18   a reasonable doubt."  That's what I'm saying.

19         THE COURT:  So here -- and I'm about -- I'm going to

20   phrase what I think is your core argument, and then I'm going to

21   turn that around as a question to Ms. Schlipper.

22         MR. BUGNI:  Okay.

23         THE COURT:  Here is what I think it is: that the crime

24   here is using interstate communication to induce a minor to have

25   sex, and there's no doubt that Mr. Hosler intended to get Gracie

```
1    to have sex with him, but he did not do it by any interstate
2    communication.  So he did not attempt to use interstate
3    communications to induce Gracie.
4              MR. BUGNI:  That's right.
5              THE COURT:  He spent all of his efforts trying to
6    persuade Amanda to allow him access to Gracie, but that he never
7    attempted to do the thing the statute prohibits, which is to use
8    interstate communication, to induce Gracie.
9              MR. BUGNI:  That's right, through the intermediary of
10   her mom.  That's right.  That's why you should be a criminal
11   defense attorney.
12             THE COURT:  Ms. Schlipper.
13             MS. SCHLIPPER:  So -- thank you, Your Honor.  I have a
14   lot of thoughts on this.  I disagree.  I think we can knock it
15   out of the park on the most narrow of definitions, but just to
16   get through all of my thoughts and I actually do have some of
17   these communications that I want to go through that.
18             THE COURT:  Okay.  Go ahead.
19             MS. SCHLIPPER:  But the whole notion of having to
20   overcome the will of the child, I mean, as you were saying that,
21   it's sort of my rebuttal argument, then it would lead -- if the
22   way Mr. Bugni says it, it would lead to an absurd result.  Then
23   whether it's a 12-year-old or a toddler or a baby, in my head
24   I'm thinking if a parent suggests on the internet "My baby loves
25   to have their feet tickled and, oh, they like to be fondled,
```

1    their penis," all of these things, "they really like this sexual

2    activity," you're basically putting it -- the responsibility on

3    the child almost like the child has the ability to consent to

4    the sexual activity, and that would be absurd if you had to

5    overcome the will in that regard.

6            THE COURT:  Yeah.  And that's -- that's only part of

7    Mr. Bugni's argument.

8            MS. SCHLIPPER:  Right, right.  I just want to address

9    them all.  And so, clearly, what we're talking about here, and I

10   think we all would agree, is what the defendant did.  And so, of

11   course, he's trying to induce Amanda, you know, let me allow --

12   or allow me to have access to Gracie, but he was trying to

13   induce, persuade, and entice Gracie, both directly and through

14   Amanda.  You know, the narrow grounds, *McMillan*, the examples

15   they give, and Attorney Bugni says -- I don't remember how he

16   phrased it, but the dick pic is really where *McMillan* hangs its

17   hat on that third prong, but the other things, they say that the

18   defendant asked the undercover "Any chance you can let me talk

19   to your daughter directly?  Maybe she can email me."  And then

20   the other -- I think these were the three things.  The defendant

21   says, "Hey, have you talked about this yet with her?"  Those are

22   the three things in *McMillan* that get you beyond a reasonable

23   doubt.  Well, here -- and even in *McMillan* they talk about --

24   they say McMillan's effort to entice the girl by wanting to send

25   her a dick pic is misguided.  Here we have this defendant

```
 1    trying -- using the internet trying to say, "Hey, let me buy
 2    this 12-year-old a princess dress that you're telling me she
 3    wants."  Nobody could say -- nobody could call that misguided.
 4    Every 12-year-old girl would love a princess dress.  The fact
 5    that he shows up with the princess dress in his car suggests
 6    that he was trying to entice her because he was coming to have
 7    sex.
 8             THE COURT:  Well, and I think that's amply established,
 9    that he did intend to entice her.
10             MS. SCHLIPPER:  Uh-huh.
11             THE COURT:  I'll say that.  The question is did he use
12    electronic communications to entice her.
13             MS. SCHLIPPER:  Okay.  So then let me, if you would
14    just bear with me, let's go through some of the communications.
15    D-003.  He told -- I mean, much like in McMillan, "I would like
16    to do Facetime or something to verify before I come" --
17             THE COURT:  Okay.  Now, this one -- I can't tell
18    whether that's a Facetime with Amanda to make sure she's not the
19    detective --
20             MS. SCHLIPPER:  Okay.
21             THE COURT:  -- or whether it's Gracie.
22             MS. SCHLIPPER:  Okay.  I believe the detective took it
23    to be the girl, but we can -- there's more.  D-043, if I'm
24    typing that in correctly, he wants to know if she's told Gracie
25    that he's coming.  I'll just go through them all, and we can --
```

1    D-044, he wants to know "What was her reaction when you told

2    her?"  I mean, these are two examples of the one that is put

3    forth in *McMillan*.  He wants her -- at the bottom of this, "What

4    was her reaction when you told her?  Because I want her to want

5    this.  Otherwise it won't be enjoyable for either party."  He

6    wants Amanda to convey to Gracie that he's the prince, that I

7    am -- you can trust me.  I want you to enjoy this.  He's

8    specifically asking Amanda "Did you tell her?"

9        Then E-006.  Let's see.  "But I can't wait to finally meet

10   you.  Did you let her know that I'm coming?"  It's right in the

11   middle of the page.  And then the mom says, "Yeah, no kidding.

12   It's been a long time.  I haven't told her yet.  Probably will

13   do tonight."  And then "Is there any way I can chat and email

14   with her or do I have to wait until I get there?  I'm sure she's

15   going to be thrilled.  I'm going to be bringing some presents as

16   well."  He's talking about bringing Gracie in the same context

17   of can I chat with her, can I email her.  This is far more

18   evidence than is in *McMillan*.  He wants direct access to be able

19   to entice Gracie.  He wants to say, "Hey, I have these dresses.

20   You should trust me.  You should like me.  I'm a good guy."

21       And then E-10.  And then -- so let's see.  E-10, he's again

22   asking if the mom told her.  He's wanting to -- like did you

23   tell her I got the dress?  Did you tell her I'm coming?  Did you

24   tell her I'm the prince that I am because I'm promising all of

25   these vacations?  And then the defendant believes -- so let's

1    see.  The defendant is believing that his excitement and

2    eagerness and gifts are so persuasive -- yeah.  I already said

3    that, so I won't say that again.

4        So then E-016.  So this -- at the bottom there, the

5    defendant says "I think we should let Gracie decide."  We

6    believe this is also another opportunity where he's trying to

7    entice Gracie directly because mom and defendant are talking

8    about you're going to be in Eau Claire.  What can you do

9    together to have some fun?  What are we going to do?  And he

10   says, "I think we should let her decide."  He wants to butter

11   her up.  Every child likes to choose the activity of the day.

12       So then if we move forward to F-009, so then after Amanda

13   tells him that Gracie was excited to meet him, he responds "Tell

14   her the feeling is mutual."  Again, I'm excited too.  I like

15   you.  My excitement is to entice you to have sex.  And then "Did

16   she pick a place for Thursday?"  So he is again saying, hey,

17   mom, did you tell her that I told her she should choose?  All of

18   these things he's -- and then -- yeah, I mean, he's basically

19   telling mom tell Gracie I'm putting her in charge.  I'm trying

20   to put her in a better position.

21       And then there's the whole communication where online

22   it's -- there is -- boy, I don't remember -- I thought I --

23   there's the one section where he talks about the size of the

24   dress and that the dress is -- you know, it's going to be a

25   little small on the bottom, but the top is a little big and -- I

1    have this somewhere.  Oh, it's E-009, right?  Or, no, D-45.  Oh,

2    no, it's E-009.  Sorry.  I think we were already there.  So he's

3    describing -- in the middle of the page, "Yeah, the dress will

4    fit her waist perfectly.  The top," blah, blah, blah, the size

5    between 23 and a half to twenty -- "Let me know when you tell

6    her and her reaction."  He is clearly using the dress to entice

7    her.  This is not even a misguided attempt to --

8          THE COURT:  Okay.  Now, I'm a little confused by that

9    because I thought that Amanda rather consistently said "I'm not

10   going to tell her about the presents," so that is a little

11   unclear to me.

12         MS. SCHLIPPER:  But he's attempting to have Amanda tell

13   her.  "Let me know when you tell her and her reaction."  That's

14   his attempt to have Amanda tell Gracie to entice her.  Whether

15   Amanda did or not is, you know, besides the point.

16         THE COURT:  That's fair, but I want to make sure I

17   understand.  "Let me know when you tell her and her reaction,"

18   tell her about the dress?  Is that clear to me?

19         MS. SCHLIPPER:  The two emails before it are "Yeah,

20   extra small will totally be fine and the dress, as long as you

21   want, and the size should be good for her."  The three emails

22   before it are about a dress.

23         THE COURT:  Okay.

24         MS. SCHLIPPER:  And then I believe the final one is,

25   you know, what we would consider kind of the ultimate attempt to

1    persuade this 12-year-old girl that he's a prince and he cares

2    for her, and it's "Give Gracie a hug for me."  He's trying to

3    use his ability to be the husband figure to Gracie to -- I mean,

4    yeah, to entice Gracie.  I mean, this is -- I believe this is

5    far more than is present in the *McMillan* case, so we have

6    nothing further.

7           THE COURT:  Okay.  All right.  Is there anything else I

8    need to hear?

9           MR. BUGNI:  You have to take the plea.

10          THE COURT:  I do.

11          MR. BUGNI:  We can do that some other time -- I mean,

12   this has been a long morning -- if you want.

13          THE COURT:  Oh, no.  We're going to do that plea.

14          MR. BUGNI:  Okay.  Let's do it.

15          THE COURT:  Get that done.  What do you want from me as

16   a result?  Do you just want me to set out particular findings?

17          MS. ALTMAN:  Guilty, not guilty.

18          THE COURT:  That's all you want?

19          MR. BUGNI:  No, I want a written order.  I think we

20   have the right to -- I can't remember what the rule is for bench

21   trials but the request that the Court's order be in writing.  It

22   doesn't have to be long, but if you're going to find it under

23   theory one -- you know, you have three theories of *McMillan*.

24   Then --

25          THE COURT:  Yes.  Yeah.  Okay.  I'll do that.  I don't

1    want to have -- if I can reduce the long written orders that I

2    have to do, it's always favorable, but I can tell you -- we

3    might as well -- I will tell you how I'm leaning, how I'm almost

4    certainly going to decide.  I do want to go back and look at

5    *Hite* to be clear about this because *Hite* seems to me, and,

6    again, that's only persuasive to me, but the suggestion there is

7    that the ultimate inducement might not be by electronic means

8    and that that would not preclude the application of the statute.

9    I think that is somewhat at variance from the theory that Mr.

10   Bugni is trying to present.  But that was -- I thought -- as I

11   read that, I thought that is fully consistent with the *McMillan*

12   approach, so I want to double-check that, and then I want to,

13   you know, do my own parsing of the statute as well.

14        But I do think that there are communications within the

15   broader complex of the very long communications, which are

16   mostly directed at *McMillan* theories one and two -- that's

17   clearly the bulk of the communications are *McMillan* theories one

18   and two -- but there are communications within this set, and

19   maybe only a handful, maybe up to a half dozen, that are using

20   Amanda as an intermediary to convey information about Mr. Hosler

21   to Gracie to overcome her resistance.  And, again, I take Mr.

22   Bugni's point, she wasn't very resistive in this fictional world

23   that has been created.  We have a completely sexualized

24   12-year-old, but I don't think that that puts her beyond the

25   reach of enticement because that would lead to a view of

1    enticement that would make it impossible to entice an infant,

2    and so I do think that there still is some will to be overcome,

3    whether it's through a combination of coercion or just making

4    the sex seem really appealing to the person with whatever

5    sexualized background they have.  I still think that there is

6    will to overcome and that I can't interpret enticement in a way

7    that would make it impossible to entice an infant.  That just

8    seems illogical and absurd to me.

9        So I will find Mr. Hosler guilty of Count 1 on alternative

10   theories.  Theory of -- *McMillan* theory one, I think there's no

11   question; theory two, no question; but even theory three, even

12   though it's a minority of the communications, some of them are

13   oriented toward Gracie through Amanda as an intermediate, and

14   it's part of the effort to make Mr. Hosler an attractive partner

15   to Gracie, and so I think that's -- that is what we have here.

16   And it's clear that it's only a part of it, but I don't think

17   there's any doubt that he used electronic communications --

18   interstate electronic communications to convey that handful of

19   messages to Gracie.  So it's part of the enticement.

20       So with that, let's do the plea on Count 3.  And so I assume

21   that, Mr. Bugni, you and Mr. Hosler have the indictment and that

22   you have talked with Mr. Hosler about Count 3 and the penalties

23   that he might face and whether he has defenses to Count 3?

24           MR. BUGNI:  I have, Your Honor.

25           THE COURT:  Okay.  And, Mr. Hosler, my understanding is

1    that you're willing to enter a plea to Count 3 today; is that

2    correct?

3            THE DEFENDANT:  Yes, sir.

4            THE COURT:  Okay.  So I need to make sure that you're

5    capable of making that decision, that you understand the -- that

6    your plea is really voluntary, that you understand the charges

7    and the penalties that might -- you might face, and I also have

8    to make sure there's a factual basis for the plea, which means

9    there's reason for me to believe that you're actually guilty.  I

10   probably already have that now, but we'll cover the script here

11   anyway.  I also need to review the rights that you'd give up if

12   you plead guilty, so I'm going to have to ask you some questions

13   that you have to answer under oath, so I'm going to ask you to

14   stand up and raise your right hand, and the clerk is going to

15   swear you to tell the truth.

16                **ROBERT HOSLER, DEFENDANT, SWORN**

17           THE COURT:  All right.  Very good.  Have a seat.

18       All right.  Mr. Hosler, I need to make sure that you

19   understand now that you've sworn to tell the truth, if you

20   knowingly give any false answers to my questions, you could be

21   prosecuted for perjury.  Do you understand that?

22           THE DEFENDANT:  Yes, sir.

23           THE COURT:  Okay.  Pull the microphone over a little

24   closer to you.  You don't need to lean into it then.  All right.

25   So my first questions are to make sure you're capable of

1    proceeding today.  So tell me how old you are.

2              THE DEFENDANT:  27.

3              THE COURT:  And how much formal education have you had?

4              THE DEFENDANT:  I received my bachelor's degree.

5              THE COURT:  Okay.  All right.  Let's find out if

6    there's anything that would interfere with your understanding or

7    your decision-making today.  Do you suffer from any physical or

8    mental illness?

9              THE DEFENDANT:  No, I do not.

10             THE COURT:  Are you on any medication?

11             THE DEFENDANT:  No, I'm not.

12             THE COURT:  Are you addicted to drugs or alcohol?

13             THE DEFENDANT:  Yes, I am.

14             THE COURT:  Okay.  Tell me about that.

15             THE DEFENDANT:  I have addiction to cocaine, marijuana,

16   alcohol.

17             THE COURT:  Okay.  And are you under the influence of

18   any drugs or alcohol right now?

19             THE DEFENDANT:  No, I'm not.

20             THE COURT:  How long have you been sober?

21             THE DEFENDANT:  About eight months.

22             THE COURT:  Okay.  Is that the time that you've been

23   incarcerated?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  Okay.  Do your substance dependencies have

1    any effect on you right now that would interfere with your

2    ability to make a good decision or to understand what we're

3    doing today?

4            THE DEFENDANT:  No, sir.

5            THE COURT:  Okay.  Is there any other reason that you

6    would not be able to follow what we're doing right now or to

7    make a good decision about pleading guilty?

8            THE DEFENDANT:  No, sir.

9            THE COURT:  All right.  So, Mr. Hosler, I'll hear it

10   from you.  Have you talked with Mr. Bugni about the nature of

11   the charge you face in Count 3?

12           THE DEFENDANT:  Yes, I have.

13           THE COURT:  And are you aware of the facts the

14   government believes it could prove if the case went to trial?

15           THE DEFENDANT:  Yes, sir.

16           THE COURT:  And are you aware -- have you discussed

17   whether you have any defenses to the charges?

18           THE DEFENDANT:  No, sir.

19           THE COURT:  Well, the question is not whether you have

20   any defenses; it's whether you've discussed that with Mr. Bugni.

21           THE DEFENDANT:  Yes, sir.

22           THE COURT:  Okay.  You have discussed it with him?

23           THE DEFENDANT:  Yes, I have.

24           THE COURT:  All right.  And have you talked about the

25   United States Sentencing Guidelines and how they might affect

1    the sentence you'll receive?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Okay.  All right.  So tell me what you

4    think you're being charged with in Count 3.

5              THE DEFENDANT:  Possession of child pornography.

6              THE COURT:  Okay.  So you -- let's review the penalties

7    that you might face on that count.

8         So, Ms. Altman, can you tell us the penalties that he'd face

9    on Count 3?

10             MS. ALTMAN:  Yes, Your Honor.  Based on the age of the

11   child alleged, he faces a 20-year maximum, a $250,000 fine, at

12   least five years of supervised release, not more than a lifetime

13   period of supervised release, a $100 special assessment, a

14   separate $5,000 special assessment, unless he's found to be

15   indigent, and he can be ordered to pay restitution.

16             THE COURT:  All right.  Very good.

17        Okay.  So you understand if I accept your plea on this

18   count, I could sentence you to up to 20 years in prison?  Do you

19   understand that?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  Okay.  I could impose a fine up to

22   $250,000.

23             THE DEFENDANT:  Yes, sir.

24             THE COURT:  Do you understand that?  Any period of

25   incarceration would have to be followed by a period of

1      supervised release that would have to be at least five years,

2      could be the rest of your life.  Do you understand that?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  Do you know how supervised release works?

5              THE DEFENDANT:  No, I do not.

6              THE COURT:  Okay.  So supervised release involves me

7      imposing certain conditions and restrictions on your conduct

8      after you serve your term of incarceration.  Do you understand

9      that?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  You'd have a supervising officer.  You'd

12     have to check in with that officer who would enforce the

13     conditions and restrictions that I have on you.  Do you

14     understand that?

15             THE DEFENDANT:  Yes, sir.

16             THE COURT:  And you know if you violate the conditions

17     or restrictions, I could send you back to prison for violating

18     those conditions or restrictions.  Do you understand that?

19             THE DEFENDANT:  Yes, sir.

20             THE COURT:  Okay.  All right.  And I will have to

21     impose the mandatory criminal assessment of $100.  That happens

22     with every felony conviction.  There's a mandatory assessment of

23     $100.  Do you understand that?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  And then for a crime like this one

1     involving child pornography, there's a mandatory $5,000 special

2     assessment for this crime that I would have to impose unless I

3     find that you're indigent.  Do you understand that?

4                 THE DEFENDANT:  Yes, sir.

5                 THE COURT:  Okay.  All right.  So let's talk about the

6     federal sentencing guidelines.  So the probation office -- and I

7     guess our colleague from the probation office isn't here, but I

8     think I know who it is.

9                 THE CLERK:  Mariah Johnson.

10                THE COURT:  Mariah Johnson is the probation officer who

11    will compile the information that I'll use in setting your

12    sentence.  One of the things -- she'll put that information in a

13    report.  One of the things the report will do will be to

14    calculate the sentencing range that is recommended under the

15    United States Sentencing Guidelines, and I want to talk a little

16    bit about the factors that go into that.

17         So the starting point will be the offense level that the

18    guidelines assign to the offense that you're thinking about

19    pleading guilty to.  Do you understand that that's the starting

20    point?

21                THE DEFENDANT:  Yes, sir.

22                THE COURT:  Okay.  And then other conduct relevant to

23    your crime gets considered, and in a possession of child

24    pornography case, the conduct that we're talking about is not

25    just the specific images that are charged but whether you have

1    other images and the nature of those images.  That gets

2    considered under the guidelines.  Do you understand that?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  Okay.  Now, the fact that you're accepting

5    responsibility by pleading guilty, assuming that there's not a

6    reason to deny you credit for that, for accepting

7    responsibility, that would be a factor that would count in your

8    favor under the guidelines.  And, honestly, I don't know if the

9    government is going to support giving you credit for acceptance

10   because we've gone to the trial and you're pleading guilty at

11   the trial, but I will tell you that under the guidelines there

12   is credit available for accepting responsibility.

13        So you understand that that's a factor that counts in your

14   favor under the guidelines?

15             THE DEFENDANT:  Yes, sir.

16             THE COURT:  Okay.  Your role in the offense gets

17   considered, and I don't know if this is a case in which anyone

18   else was involved, but we would look to see whether you're a

19   leader, and that might count against you, or a manager of the

20   crime.  If you're a more minor participant, it might count in

21   your favor, or if you did anything that would interfere with the

22   investigation of your offense, that's also considered part of

23   your role.

24        Do you understand that your role in the offense gets

25   considered?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Your prior criminal history, if you have

3     any, that gets considered under the guidelines too.  Do you

4     understand that?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Then I want to make sure you understand the

7     general perspective of the guidelines, and that is to consider a

8     broad range of factors about you and your background, about your

9     crime and how it was committed and its impact on any victims or

10    society as a whole.  So you understand that the guidelines are

11    designed to consider a broad range of factors?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  Okay.  Let's talk about the process a

14    little bit, and this applies not just to Count 3 but on any of

15    the counts you're convicted on.  But Ms. Johnson will prepare

16    this presentence report, and I'll get a copy of it, you and your

17    lawyer will get a copy of it, and the government will get a copy

18    of it.  When you get that presentence report, review it

19    carefully with your lawyer.  Will you do that?

20         THE DEFENDANT:  Yes, sir, I will.

21         THE COURT:  Okay.  And so if there's anything in there

22    that you think is incorrect or if you think something important

23    has been left out or if you don't think the guidelines are

24    calculated right, you can raise objections to me.  Do you

25    understand that you'll have that right?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  The government also can make objections,

3     and then at your sentencing hearing, I'll rule on any

4     objections.  I'll make a final decision about what goes in your

5     presentence report and what -- about what the final correctly

6     calculated guideline range should be.  Do you understand that

7     process?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  Okay.  So here's the most important thing

10    to take away from our discussion of the guidelines, and that is

11    that they're only advisory.  I will consider them, but I don't

12    have to follow them strictly, and if I think a sentence either

13    above the guidelines or below the guidelines is appropriate

14    after I consider everything the law tells me I have to consider,

15    I can impose a sentence outside the guideline system.  So you

16    understand the guidelines are only advisory?

17         THE DEFENDANT:  Yes, sir.

18         THE COURT:  Okay.  All right.  By pleading guilty

19    today, you'll give up constitutional rights that you would have

20    as a person who is accused of a crime, so I want to review some

21    of those rights with you.

22       Do you understand that you have a right to go to a trial and

23    have a jury decide whether you're guilty?

24         THE DEFENDANT:  Yes, I do.

25         THE COURT:  You've already waived that right with

1    respect to the charges here but -- so this is old news to you,

2    but you would have the right to have a jury decide if you're

3    guilty.  The jury would have 12 people.  They would all have to

4    unanimously find you guilty beyond a reasonable doubt for you to

5    be convicted.  Do you understand that?

6         THE DEFENDANT:  Yes, sir.

7         THE COURT:  Okay.  Do you also know that under the

8    Constitution of the United States, no one can be forced to admit

9    that they've committed a crime?  Do you understand that?

10        THE DEFENDANT:  Yes, sir.

11        THE COURT:  Okay.  That means you do not have to plead

12   guilty.  You can plead not guilty and require the government to

13   prove your guilt beyond a reasonable doubt.  Do you understand

14   that?

15        THE DEFENDANT:  Yes, sir.

16        THE COURT:  And you know if the case went to trial, you

17   would not have to testify.  Do you understand that?

18        THE DEFENDANT:  Yes, sir.

19        THE COURT:  And you know that you would have -- if it

20   were your choice, you'd have the right to testify if that's what

21   you wanted to do.  Do you understand that?

22        THE DEFENDANT:  Yes, sir.

23        THE COURT:  You'd also have the right to confront and

24   cross-examine the government's witnesses, which means you could

25   face them here in the courtroom and have your lawyer ask them

1    questions.  Do you understand you'd have the right to confront

2    and cross-examine the government's witnesses?

3            THE DEFENDANT:  Yes, I do.

4            THE COURT:  Okay.  And you would have the right to call

5    your own witnesses, and even if they didn't want to testify, you

6    could compel them to testify by using a subpoena.  Do you

7    understand that?

8            THE DEFENDANT:  Yes, sir.

9            THE COURT:  All right.  A felony offense affects your

10   civil rights outside the scope of this proceeding, and I want to

11   make sure you understand some of the ways that will happen.

12       First of all, you understand that a felony conviction can

13   affect your right to vote.  Do you understand that?

14           THE DEFENDANT:  Yes, I do.

15           THE COURT:  All right.  Under -- the laws of the states

16   vary, but I'll tell you what happens in Wisconsin law.  Under

17   Wisconsin law, while you're serving any term of incarceration or

18   under any form of supervision, you would not have the right to

19   vote.  Do you understand that?

20           THE DEFENDANT:  Yes, sir.

21           THE COURT:  You would also not have the right to serve

22   on a jury or the right to hold public office.  Do you understand

23   that?

24           THE DEFENDANT:  Yes, sir.

25           THE COURT:  Also, as a person convicted of a felony,

1    you'd be permanently deprived of the right to possess any kind

2    of firearm or ammunition.  Do you understand that?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  And if you did possess a firearm or

5    ammunition, you could be charged with a new crime for that.  Do

6    you understand?

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  A felony conviction could also affect your

9    immigration and residency status and could result in additional

10   immigration-related penalties, including possible deportation if

11   you were not a United States citizen.  That may not apply to

12   you, but I review all the rights with everyone.  So you

13   understand that it could affect your immigration -- could

14   provide immigration-related penalties?

15             THE DEFENDANT:  Yes, sir.

16             THE COURT:  Last point about your rights:  I want to

17   make sure you have the right to counsel at all phases of this

18   proceeding, including counsel appointed at government expense if

19   you can't afford one.  Do you understand that?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  Okay.  All right.  I think we probably have

22   covered the factual basis for the plea, but we didn't spend a

23   lot of time on it.  We did discuss the nature of the images, so

24   we don't need to review that again.  But if you would, let's

25   establish the other aspects of the factual basis for the plea.

1          MS. ALTMAN:  Yes, Your Honor.  Most of the factors are

2     in the stipulation.  I think that would cover them all.  Other

3     than that, the only thing that matters is that he had the phone

4     in his possession on September 6th when he was arrested.  It was

5     a Samsung SM-G960U cellphone, and it was manufactured outside

6     the State of Wisconsin.

7          THE COURT:  Okay.  All right.  Mr. Bugni, the

8     government can prove those extra things?

9          MR. BUGNI:  Yes, Your Honor.

10         THE COURT:  Okay.  Mr. Hosler, same question to you:

11    Can the government prove those things?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  Okay.  And so you admit that you possessed

14    child pornography on the phone that was yours?

15         THE DEFENDANT:  Yes, sir.

16         THE COURT:  Okay.  And you knew it was child

17    pornography?

18         THE DEFENDANT:  Yes, I did.

19         THE COURT:  Okay.  And I think that probably covers it.

20    Ms. Altman, is there anything else?

21         MS. ALTMAN:  I don't think so, Your Honor.

22         THE COURT:  Okay.  All right.  Mr. Hosler, then I will

23    ask you, what is your plea to Count 3 of the superseding

24    indictment?

25         THE DEFENDANT:  I plead guilty.

1          THE COURT:  All right.  On the basis of this discussion

2     with you and your attorney, on the basis of the record in the

3     case as a whole, I'm satisfied that you've entered a plea of

4     guilty knowingly and voluntarily after an adequate opportunity

5     to consult with your attorney with an understanding of the

6     nature of the charge and the consequences of a plea of guilty.

7     I'm also satisfied that there's a factual basis for the plea.

8     Accordingly, I find you guilty of the charge contained in Count

9     3 of the indictment.

10        I think that's probably it.  I don't know if it makes sense

11    to do our scheduling now since I've got to do the written order.

12    I don't expect it to take too long.  I want to do it while its

13    fresh in my mind, but I think we'll propose a schedule to you

14    with the order.

15          MR. BUGNI:  Okay.

16          THE COURT:  Would you ask for the expedited sentencing?

17          MR. BUGNI:  No.

18          THE COURT:  Okay.  All right.  All right.  I'll find

19    out after I issue an order what our schedule would likely be.

20          MR. BUGNI:  Do you want me to file a Rule 29 -- it's a

21    little bit weird with a bench trial.  Do you want me to file a

22    Rule 29 motion within 15 days of -- you've already thought about

23    it, so I kind of --

24          THE COURT:  Yeah.  I just want you to preserve your

25    rights is what I want to do, so file it within whatever time you

1    want, so I've thought pretty deeply about it, so I don't -- you

2    know, I can't give much more analysis than I've already given

3    you.

4              MR. BUGNI:  No, and I don't think -- I mean, I don't

5    want -- you've got enough work.  I think your order doesn't have

6    to be long.  I think as long as you didn't do, like, *McMillan*

7    one, and then, you know, the Court of Appeals is left guessing,

8    I guess it's just --

9              THE COURT:  No, no.  I'm going to walk through it all

10   the way because I know your position is *McMillan* theory three is

11   really what you're relying on, and then presumably you're going

12   to attack the whole *McMillan* third-party approach, and good luck

13   to you with that but --

14             MR. BUGNI:  Thanks.

15             THE COURT:  -- that's, you know, that's your right, but

16   it's certainly not my -- within my authority to really even

17   seriously consider that argument.

18        All right.  So we'll get an order out to you as soon as we

19   can.

20        Anything else for you?

21             MS. ALTMAN:  Yes.  I don't know that it really matters

22   at this point, but we'd also ask for guilty on Count 2.

23             MR. BUGNI:  Yeah.

24             THE COURT:  Oh, yes, of course.  And I will reflect

25   that in the written order too, but I also -- I find Mr. Hosler

1    guilty on Count 2.

2            MS. ALTMAN:  The other thing that we would ask for in

3    the finding -- I think Mr. Bugni stipulates to it -- is a

4    forfeiture of the items in the indictment.  There is one item

5    that I believe that we can return, which is the Samsung tablet,

6    but I would submit that the rest of the items we established

7    were going to be used to facilitate these offenses.

8            MR. BUGNI:  We agree with that, Your Honor.

9            THE COURT:  Okay.  So I will grant the forfeiture of

10   those -- for the Samsung tablet, that was not involved -- that

11   was seized but not involved, and so you're going to return that.

12           MS. ALTMAN:  That is correct.

13           THE COURT:  Okay.  Very good.  And so I'll grant the

14   forfeiture on the other items.

15      Anything else?

16           MS. ALTMAN:  Not from us, Your Honor.

17           THE COURT:  Mr. Bugni, Mr. Hosler, anything else?

18           MR. BUGNI:  Ms. Altman and I can work it out.

19           THE COURT:  All right.  Very good.  All right.  Thank

20   you, all.

21           THE CLERK:  This Honorable Court stands adjourned.

22      (Proceedings concluded at 12:43 p.m.)

23                              ***

24

25

1        I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

2   Reporter in and for the State of Wisconsin, certify that the

3   foregoing is a true and accurate record of the proceedings held

4   on the 17th day of May, 2019, before the Honorable

5   James D. Peterson, Chief U.S. District Judge for the Western

6   District of Wisconsin, in my presence and reduced to writing in

7   accordance with my stenographic notes made at said time and

8   place.

9        Dated this 21st day of October, 2019.

10

11

12

13

14

15                          _____/s/ Jennifer L. Dobbratz_____

16                          Jennifer L. Dobbratz, RMR, CRR, CRC
                                 Federal Court Reporter
17

18

19

20

21

22

23

24   The foregoing certification of this transcript does not apply to
     any reproduction of the same by any means unless under the
25   direct control and/or direction of the certifying reporter.